HARRY H. ELLIS, d/b/a Photo America of Chicago, Inc., Plaintiff-Appellee, *v.* PHOTO AMERICA CORPORATION, Defendant-Appellant.

First District (1st Division)    No. 81—2231

Opinion filed March 14, 1983.—Rehearing denied April 25, 1983.

494

Junie L. Sinson and Thomas J. Swabowski, both of Barclay, Damisch & Sinson, of Chicago, for appellant.

Edward T. Joyce and James E. Dahl, both of Joyce and Kubasiak, of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Harry H. Ellis, brought this action against defendant, Photo America Corporation, a Delaware corporation, seeking recovery of compensation due under an employment agreement with defendant and *quantum meruit* relief for services performed subsequent to the termination of the employment contract. Following a bench trial, the trial court entered judgment for plaintiff in the amount of $15,307.96 on plaintiff's claim under the employment contract and in the amount of $95,497.14 in *quantum meruit* relief. On appeal, defendant contends that: (1) the trial court erred in considering plaintiff's claim for equitable relief because the evidence established that plaintiff was guilty of "unclean hands"; (2) the evidence established that plaintiff, not defendant, breached the employment contract between the parties; and (3) the trial court improperly valued plaintiff's services in its award of *quantum meruit* relief.

The record discloses that, in 1975, plaintiff, Harry H. Ellis, and Walter Hutterli, an officer of World Photo Marketing, a European cor-

poration, discussed the formation of a new company to distribute cameras and photographic accessories for a Japanese camera manufacturer. From the record, it appears that neither World Photo Marketing nor the Japanese manufacturer had previously conducted business in the United States. As a result of the discussions between plaintiff and Hutterli, it was agreed that plaintiff would become president of a newly formed Delaware corporation, Photo America Corporation (PAC). PAC was incorporated as a wholly owned subsidiary of World Photo Marketing. On October 20, 1975, plaintiff commenced employment with PAC. In January 1976, plaintiff and PAC entered into an employee agreement, which agreement was backdated to October 20, 1975. The agreement was for a period of one year with either party being able to terminate the agreement upon six months' notice. Pursuant to the employment agreement, plaintiff was to receive a salary of $50,000 per annum. A separate "Memorandum of Agreement" dated October 20, 1975, further provided that plaintiff was to receive, in addition to the salary provided for in the employment agreement, additional compensation of $6,250 per quarter.

From the record, it appears that difficulties between plaintiff and Hutterli developed. In March 1976, plaintiff requested from Hutterli "a complete understanding as to what [his] responsibilities are" with respect to PAC. Subsequently, plaintiff was invited to a meeting in Switzerland in late April 1976 with Hutterli and several directors of Interdiscount Service S.A., the parent corporation of World Photo Marketing. According to plaintiff and Hutterli, it was agreed at the meeting that it was necessary to make changes within PAC. Hutterli proposed to plaintiff that plaintiff become a commissioned agent for PAC, rather than its president and employee.

While still in Switzerland, plaintiff was given a draft proposal of the agency agreement between World Photo Marketing, PAC and plaintiff. The draft agreement set forth a commencement date of June 1, 1976, and a termination date of December 31, 1977. The proposal classified the transactions for which plaintiff was to receive a commission. Case I sales involved sales to major United States customers who purchased directly from the supplier against letters of credit. In case I sales, plaintiff and PAC would share equally in profits after payment of certain costs. Case II sales involved instances where plaintiff would be dealing with main customers purchasing $30,000 or more in goods from PAC. In case II sales, plaintiff and PAC would share equally in profits after the payment of certain costs. Case III sales involved sales to the military for which plaintiff would not receive any commission. Case IV sales involved sales to smaller cus-

tomers. In case IV sales, plaintiff would receive the entire profit after the payment of certain costs. The proposal also provided that plaintiff was entitled to a draw of $7,000 per month against commission.

In early May 1976, a second proposal which, according to Hutterli, contained a few alterations or corrections was prepared and sent to plaintiff in the United States. From the record, it appears that the commission rates were substantially the same as in the first draft of the agency agreement. The second draft also retained the same commencement and termination dates. The second draft stated that plaintiff would be entitled to a maximum draw of $7,000 per month which would be subject to review.

According to plaintiff, he requested the corporate attorney for PAC to prepare a third draft of the agency agreement. The commission schedule of the third draft was substantially similar to the prior two drafts of the agency agreement. The third draft deleted a section of the prior drafts which pertained to arbitration of any disputes in Switzerland and added a section which permitted plaintiff to assign the contract to any corporation in which he held a majority interest. The third proposal also provided that plaintiff would receive $7,000 on the first of each month, which amount would be credited against plaintiff's commissions. According to plaintiff, two copies of the third draft were prepared, an English version and a Swiss version. The English version left blank the commencement date of the agreement, whereas the Swiss version retained the June 1, 1976, commencement date. Both versions stated that the agreement terminated on December 31, 1977.

Plaintiff testified that in mid-May 1976, he spoke with Robert Becker, the sales manager of PAC, about the changes that would be occurring within PAC. Subsequently, Becker met with Hutterli in Switzerland. Upon his return, Becker presented to plaintiff a list of tasks to be completed prior to Hutterli's arrival in the United States in late May. Plaintiff met with Hutterli in late May, at which time plaintiff gave Hutterli a copy of the third draft of the agency agreement.

Upon returning from a sales trip in early June, plaintiff met Joaquin Armengol. Armengol gave plaintiff a packet of materials which included a letter of introduction from Hutterli which stated that Armengol was the new general manager and head accountant of PAC. A check for $7,000 was also included in the packet and the cover letter attached to the materials stated that the $7,000 was "as agreed by [plaintiff] with Mr. Hutterli." The reverse side of the check was typed with the following notation: "Draw against future salaries

or commissions due from Photo America Corp." The packet of materials contained a direction to plaintiff that he was no longer authorized to use the PAC bank account and a memorandum which stated that after June 1, 1976, all sales "effected by [plaintiff] directly to [his] customers should [be] invoiced with a letterhead reading something like 'Harry Ellis Agent for PAC' " and that plaintiff should not use old PAC invoices as he had done in the past.

In mid-June 1976, plaintiff met with Hutterli in Tokyo, at which time Hutterli gave plaintiff a letter dated June 12 which gave plaintiff notice pursuant to the October 20, 1975, employment agreement that plaintiff's employment would be cancelled as of December 31, 1976. According to Hutterli, he informed plaintiff that the third draft of the agency agreement was unacceptable and that PAC would not consider doing business based upon the third draft of the agreement. Hutterli also stated that he and plaintiff discussed the amount of money that plaintiff would receive pursuant to the October 20 employment contract. On July 7, 1976, plaintiff and Hutterli met and again were unable to reach an agreement concerning plaintiff's relationship with PAC. At this meeting, Hutterli informed plaintiff that his employment with PAC was terminated. On July 13, plaintiff received a letter from Hutterli which indicated that plaintiff's employment with PAC was terminated. On August 4, plaintiff submitted a written demand for profits for case I and case IV sales, severance pay and additional salary for October 20, 1975, to May 31, 1976, which was not received by plaintiff.

Subsequently, plaintiff brought this action. PAC raised as an affirmative defense to plaintiff's claim for equitable relief the defense of unclean hands. Defendant argued that plaintiff transferred funds to his corporation for the purpose of "laundering money to be used for the bribery of customers." Following a bench trial, the trial court found as follows: that PAC failed to meet its burden of establishing unclean hands; that the equities in the case were with plaintiff; that plaintiff performed his duties under the October 20, 1975, employment agreement and that PAC breached the agreement in its failure to pay plaintiff the additional salary as set forth in the agreement; and that plaintiff was entitled to recover the reasonable value of his services beginning on June 1, 1976. Accordingly, the court entered judgment for plaintiff in the amount of $110,805.10 which represented $15,307.96 for plaintiff's breach of contract claim and $95,497.14 for plaintiff's claim for *quantum meruit* relief. Defendant appeals.

PAC first contends that the trial court erred in its award of equitable relief because plaintiff had "unclean hands." PAC argues

that plaintiff's testimony established that plaintiff made payments to the purchasing representatives of various companies in order to obtain the business of those companies. PAC also urges that plaintiff had "unclean hands" because he diverted PAC funds to pay salaries to his sons. PAC maintains that plaintiff also received payments from an advertising agency which was used by PAC. PAC contends that plaintiff's failure to explain the payments received from the advertising agency or the salaries paid to plaintiff's sons through a family owned business called "Beck Associates" raises the presumption that plaintiff was engaged in fraudulent conduct. In support of its arguments, PAC cites *Nathan v. Tenna Corp.* (7th Cir. 1977), 560 F.2d 761, in which the Seventh Circuit, applying Illinois law, held that the illegal conduct of a sales representative precluded recovery of commissions due on sales.

Plaintiff maintains that the trial court correctly concluded that PAC failed to meet its burden of establishing "unclean hands." Plaintiff argues that in order to establish the equitable defense, PAC must show that there must be some type of fraud or misconduct by plaintiff in connection with the very transaction at issue before the court. See *Mascenic v. Anderson* (1977), 53 Ill. App. 3d 971, 369 N.E.2d 172.

It is a fundamental rule that one seeking equitable relief cannot take advantage of his own wrong or, in other words, he who comes into equity must come with "clean hands." (*Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069; *Metcalf v. Altenritter* (1977), 53 Ill. App. 3d 904, 369 N.E.2d 498.) In order to defeat recovery in equity under the "unclean hands" doctrine, plaintiff must be guilty of misconduct in connection with the very transaction at issue and the misconduct, fraud or bad faith must be directed toward the defendant who raises the equitable defense of "unclean hands." (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 422 N.E.2d 1166.) The "unclean hands" doctrine is not favored by the courts and it is not intended to prevent a court from doing complete justice. (*Baal v. McDonald's Corp.*; *Smith v. Marzolf* (1980), 81 Ill. App. 3d 59, 400 N.E.2d 949.) In addition, the application of the doctrine rests within the sound discretion of the trial court. *Baal v. McDonald's Corp.; Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.*

Under the principles which we have set forth, the "unclean hands" of plaintiff must be in connection with the very transaction that forms the basis of his claim for *quantum meruit* relief. From the record, it appears that the trial court was correct in concluding that PAC failed to prove that plaintiff engaged in conduct which could be

characterized as "unclean hands." PAC has also failed to establish by any competent evidence support for its contention that the alleged "unclean hands" occurred in connection with the very transaction which gives rise to plaintiff's claim for equitable relief. In addition, it does not appear from the record that PAC has been defrauded by the conduct of plaintiff. See *Baal v. McDonald's Corp.*

Additionally, PAC's reliance upon *Nathan v. Tenna Corp.* (7th Cir. 1977), 560 F.2d 761, is misplaced. In that case, a manufacturer's representative brought suit against the manufacturer for recovery of commissions due under a contract. Prior to the lawsuit, the representative pleaded guilty to mail fraud in connection with a commission-splitting scheme with an employee of the manufacturer's customer. In affirming the district court's dismissal of the action, the Seventh Circuit concluded that public policy precluded recovery by plaintiff because his conduct was of a sufficiently serious nature to prevent the courts from enforcing an arguably severable promise to pay commissions. The Seventh Circuit also noted that the performance of the contract was accomplished, in part, through the commission of criminal acts. In the instant case, the evidence adduced at trial does not establish that plaintiff's conduct was of a criminal nature or was of a sufficiently serious nature so as to preclude the award of equitable relief. Accordingly, we conclude the trial court did not err in declining to apply the doctrine of "unclean hands" as the evidence failed to establish the equitable defense.

▇ PAC next urges that the trial court erred in concluding that PAC breached the October 20, 1975, employment agreement. PAC argues that plaintiff was guilty of bad faith in his dealings with PAC and of wilful disregard of his duties under the agreement. In its findings, the trial court concluded that plaintiff fulfilled all of his duties under the October 20 agreement and that PAC breached the employment contract in its failure to pay plaintiff the additional compensation as set forth in the separate "Memorandum of Agreement." The additional salary was $15,307.96, which amount was calculated by prorating the $25,000 annual additional compensation for the period from October 20, 1975, to May 31, 1976. In reviewing the findings of the trial court, a court of review will not disturb the trial court's findings unless the findings are contrary to the manifest weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205.) In its brief, PAC makes allegations of misconduct and bad faith by plaintiff; however, PAC has again failed to offer support and evidence of its assertions of plaintiff's misconduct. From the record, it appears that plaintiff performed his duties as set forth in the employ-

ment agreement. Plaintiff was responsible for beginning the operations of PAC and for procuring sales on behalf of PAC. It further appears that plaintiff discharged his duties as an officer and general manager of PAC. In addition, the record does not indicate that plaintiff failed to devote his full business time and best efforts to PAC. The trial court also found that PAC breached the October 20 agreement with plaintiff by its failure to pay the additional compensation to plaintiff. We agree with the findings of the trial court and hold that the court's findings were not contrary to the manifest weight of the evidence.

■ PAC's final contention is that the trial court erred in computing the amount awarded to plaintiff in *quantum meruit* relief. PAC maintains that the only relationship which existed between plaintiff and PAC was the October 20 employment agreement and that that agreement was to be terminated on December 31, 1976, pursuant to a notice of termination effective June 30, 1976. PAC also contends that recovery in *quantum meruit* is intended to compensate plaintiff for the reasonable value of his services and that the court's award was excessive.

From the record, it appears that the trial court properly concluded that the parties had, by mutual agreement, terminated the October 20 employment agreement and that the termination date of that agreement was May 31, 1976. Although the parties contemplated a commission agreement for the period beginning on June 1, 1976, the parties were unable to reach such an agreement. During the course of negotiations, PAC proposed a commission schedule for sales which plaintiff made. From the various proposed contracts in the record, it appears that plaintiff would be entitled to a draw against commissions in the amount of $7,000 per month, which sum was paid to plaintiff in early June 1976. Thus, from the record, we cannot say that the trial court erred in finding that, as a result of PAC's conduct, plaintiff was entitled to recover the value of his services rendered from June 1, 1976.

Since the basis of recovery under *quantum meruit* is that it would be unjust to permit a defendant to retain a benefit from a plaintiff without compensating plaintiff, the measure of recovery is the reasonable value of plaintiff's services. (*Business Development Services, Inc. v. Field Container Corp.* (1981), 96 Ill. App. 3d 834, 422 N.E.2d 86.) The trial court granted recovery to plaintiff in the amount of $95,497.14 as commissions for case I and case IV sales. In determining this amount, the trial court utilized the commission formula which

PAC proposed during negotiations with plaintiff. Under the facts of this case, the trial court's reference to the commission formula proposed by PAC is not an improper measure in which to determine the reasonable value of plaintiff's services. Since the amount of damages is purely a factual issue, a court of review may not set aside the determination of damages unless it is contrary to the manifest weight of the evidence. (See *Anderson v. Gewecke* (1976), 36 Ill. App. 3d 170, 343 N.E.2d 673.) The basis for the trial court's award of $95,497.14 is adequately supported by the documents which have been introduced at trial and, therefore, the award is not contrary to the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGLOON and GOLDBERG, JJ., concur.