MOR-WOOD CONTRACTORS, INC., Plaintiff-Appellee, v. CRAIG OTTINGER *et al.*, Defendants-Appellants.

Second District No. 2—89—1320

Opinion filed November 8, 1990.

Emalfarb, Swan & Bain, of Highland Park (Peter G. Swan, of counsel), for appellants.

Charles R. Purcell, of Chicago, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

After a bench trial conducted by the circuit court of Lake County, plaintiff, Mor-Wood Construction, Inc. (Mor-Wood), was awarded $30,170.50 under the theory of *quantum meruit* for the reasonable value of services it performed in partially constructing a home for defendants, Craig and Heike Ottinger (the Ottingers).

The Ottingers now appeal from the judgment entered below, and they raise four issues on appeal: (1) whether the trial court erred in determining that the parties' conduct evidenced a rescission of the contract rather than a unilateral abandonment on the part of Mor-Wood; (2) whether there was sufficient evidence of the reasonable value of the work performed by Mor-Wood to support an award under *quantum meruit*; (3) whether the trial court erred in failing to apply the actual cost measure of recovery; and (4) whether the trial court's calculation of damages failed to reflect credits due the Ottingers.

The dispute between the parties arose after they entered into a contract whereby Mor-Wood was to construct a single-family home for the Ottingers. The action below commenced with Mor-Wood's filing of a three-count complaint against the Ottingers. Count I sought foreclosure of a mechanic's lien; count II alleged a breach of contract; and count III sought recovery under *quantum meruit*. The Ottingers filed a two-count counterclaim against Mor-Wood. Count I of the counterclaim sought recovery for Mor-Wood's failure to complete construction of the home and for defective workmanship; count II sought recovery under a theory of fraudulent inducement. The Ottingers also filed a third-party complaint against Frank Morvay and Tim Morvay, officers of Mor-Wood, alleging fraudulent inducement. The Ottingers voluntarily dismissed the third-party complaint and count II of the counter-

claim before judgment.

The facts adduced at trial can be summarized as follows. In June 1987, the Ottingers purchased an undeveloped parcel of property in the Village of Hawthorn Woods (the Village). On June 30, 1987, J. & W. Trenching Service, Inc., filed with the Lake County Health Department (the Health Department) an application for a permit to build a septic system for the property on the Ottingers' behalf. The site plan accompanying the application, which was based on a plan originally made for the prior owner of the property, showed a proposed septic field to the west of the planned home. The site plan also showed a proposed drainage swale to be cut on the southwest portion of the lot. The Health Department issued the Ottingers a septic permit on approximately July 21, 1987, based on J. & W.'s application.

In July 1987, the Ottingers retained an architect to draw up plans for the construction of a single-family home on the property. The architect's site plan shows that the house was to be set slightly counterclockwise on the lot instead of being perfectly square within it. The site plan also shows that the lot was to be graded to create a valley or swale sloping away from the southwest corner of the home.

The Ottingers and Mor-Wood began negotiations for a contract for construction of a house on the property. The Ottingers gave Mor-Wood three sets of the architect's plans and the application for the septic permit on August 17, 1987. On August 30, 1987, the parties entered into a contract under which Mor-Wood was to completely grade the property and construct the home pursuant to the architect's plans and specifications for a price of $152,500. The work was to be completed by February 1, 1988. Two of the contract's provisions are relevant here. Section 9.4 states:

"If the Contractor fails to correct defective Work or persistently fails to carry out the Work in accordance with the Contract Documents, the Owner, by a written order, may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated."

Section 20.2 provides:

"If the Contractor defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform any provision of the Contract, the Owner, after seven days' written notice to the Contractor and without prejudice to any other remedy he may have, may make good such deficiencies and may deduct the cost thereof *** from the payment then or thereafter due the Contractor or, at his option *** may terminate the Contract and take possession of the site

and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever method he may deem expedient, and if the unpaid balance of the Contract Sum exceeds the expense of finishing the Work, such excess shall be paid to the Contractor, but if such expense exceeds such unpaid balance, the Contractor shall pay the difference to the owner."

Mor-Wood retained Lake-Cook Trenching as a subcontractor for the project, and Lake-Cook applied to the Health Department for a new septic permit on September 21, 1987. Accompanying the application was a site plan showing the septic field to the south of the home instead of to its west, and the plan did not reveal a swale as indicated on the architect's plans. The planned home was depicted as sitting square within the lot rather than being turned slightly counterclockwise. The permit was issued on October 21, 1987. Tim Morvay testified that, while the lot was being graded, Craig Ottinger insisted that the swale be cut even though Morvay indicated that it would traverse the septic area. The excavator who cut the swale testified that it was cut at Ottinger's insistence and over Tim Morvay's objection. Morvay testified that the Health Department was then called to examine the site to determine if the swale cut necessitated reevaluation of the septic field.

At some point thereafter, a Health Department inspector visited the jobsite, and, as a result of his inspection, the inspector sent a letter to the Ottingers on November 6, 1987, stating that the septic permits were revoked as of that day. The letter gave the following reasons for revocation: (1) soil in the lot had been damaged by the traffic of heavy equipment; (2) unacceptable fill had been placed and compacted in the septic area; (3) the swale as cut interfered with septic lines and reduced the available septic absorption area; and (4) the house had been placed 10 feet south of the location indicated on the plans submitted to the Health Department, further reducing the available septic area. Tim Morvay testified that, after he learned of the letter, he discussed the septic problems with Ottinger and ordered a new soil test to be taken.

On November 17, Tim Morvay met with Craig Ottinger to pick up a check for partial payment under the contract, and Ottinger issued a check to Mor-Wood in the amount of $52,431. Sometime on November 17, the Village posted a "stop work" order on the Ottingers' property because of the revoked septic permits. Later that day, Ottinger discovered the stop-work order on the property, and so he stopped payment on the check. Ottinger testified that he telephoned Frank Mor-

vay to inform him that he was stopping payment of the check, but he denied firing Mor-Wood. Frank Morvay testified that Ottinger was "very upset" when he called on November 17. Morvay was told that Ottinger's attorney would contact him, and Ottinger further told him, "[Y]ou're fired, I don't want you on the job any more and that's it." Both Frank and Tim Morvay denied that they knew the stop-work order had been posted when the $52,431 check was collected from Ottinger.

Later on November 17, Ottinger met with attorney Lawrence Rochell to discuss the situation. At trial, Rochell recounted what he was told by Ottinger:

> "[H]e told me that he had been upset for some period of time because he had been requesting copies of subcontractor bills and that the builder would not give them to him. He was upset because the builder had asked him for a check toward construction in the face of this work stoppage order and he gave that check, then he received the letter so he stopped payment on that check, and he wanted to be placed back to where he was originally and finish the job himself and have the builder leave the project."

The next day, Rochell telephoned Rick Ament, Mor-Wood's attorney. Rochell testified that, in his conversation with Ament, he stated that "there were many areas of negligence that we believed Mor-Wood Contractors performed resulting in this work stoppage order and we have to get together and talk about it." Rochell then sent a letter to Ament restating his client's concern that the Morvays had attempted to secure a check from Ottinger despite their alleged knowledge that a stop-work order had been posted. The letter indicated that Mor-Wood had failed to give the Ottingers copies of subcontractor's affidavits as requested and that Mor-Wood's negligence led to the stop-work order issued after revocation of the septic permit. The letter stated that the Ottingers were exercising their rights under article 20 of the contract by demanding that Mor-Wood "stop any further work at the project site." The letter closed by stating:

> "Upon a review of the enclosed material and comparing it to the contract executed by the parties, I believe you will agree that a recission [sic] of this contract would be in your client's best interests.
>
> I am happy to discuss this further."

Rochell testified that, in drafting the letter, he "didn't talk about termination" because he wanted to avoid litigation for his client. It was Rochell's understanding that the problem with the septic field

might render the home uninhabitable for several years and that damages could be "theoretically substantial." As a result, Rochell felt that Mor-Wood would want to talk to him about "placing everything back to where they were before the contract was entered into."

Mor-Wood's workers left the jobsite on or about November 19, and all of Mor-Wood's equipment was also removed at this time. The parties and their attorneys did not meet again until December 8, 1987. At the meeting, each party contended that the problem with the septic field was caused by the other party. The meeting concluded with each side submitting a list of damages to the other.

The Ottingers subsequently completed construction of the home without Mor-Wood's involvement. They retained PAF & Associates to redesign the septic field. The septic field was only slightly modified in order to receive the Health Department's approval. The field remained south of the home in the same general area, but it was extended somewhat to the west. The septic lines south of the home were shortened to allow for isolation of the swale cut. A percolation test indicated that the soil in the septic area had not been damaged, and no new fill was required. George G. Carlberg, who had been employed as a carpenter for 15 years by George A. Carlberg & Sons Company, testified that he was retained by the Ottingers to finish the framing work on the house. Carlberg estimated that 75% of the rough work and one-third of the full carpentry work had already been completed before he began working on the house. Carlberg stated that the prior work on the house constituted "a well constructed job."

Both parties testified as to expenses they incurred in the project. Gloria Morvay, Frank Morvay's wife and Tim Morvay's mother, testified that she kept Mor-Wood's books. Gloria Morvay testified regarding her entries in three different accounting documents: a ledger of the Ottingers' account with Mor-Wood; a calculation of the amount of the mechanic's lien made November 9, 1987; and a "Re Cap" of Ottingers' account through November 30, 1987. The ledger showed that, as of November 21, Mor-Wood had expended $57,674.50 on the Ottinger construction project. An examination of all three documents reveals that this amount disbursed equaled the total of the following ledger entries:

| 8/21/87 | Village | 100.00 |
| 9/05/87 | Village | 1952.20 |
| 9/09/87 | Village | 23.00 |
| 10/15/87 | James Morvay (carpenter) | 2000.00 |
| 10/26/87 | James Morvay | 3000.00 |
| 10/26/87 | Les Johnson (concrete) | 5000.00 |

| | | |
|---|---|---|
| 11/02/87 | Don Adams (steel) | 1163.70 |
| 11/09/87 | James Morvay | 1000.00 |
| 11/20/87 | James Morvay | 1500.00 |
| 11/20/87 | Ryan Excavating | 2200.00 |
| 11/24/87 | Les Johnson | 2000.00 |
| 11/30/87 | Les Johnson | 4000.00 |
| 12/14/87 | Les Johnson | 2700.00 |
| 12/14/87 | Ryan Excavating | 1250.00 |
| 12/28/87 | Wolohan Lumber (credit) | (157.77) |
| 12/31/87 | Wolohan Lumber | 16000.00 |
| 12/28/87 | Wolohan Lumber | 6368.37 |
| 1/08/88 | James Morvay | 1500.00 |
| 1/30/88 | James Morvay | 500.00 |
| 2/17/88 | James Morvay | 500.00 |
| 4/26/88 | James Morvay | 1000.00 |
| 6/06/88 | Lake-Cook Trenching | 75.00 |
| 7/18/88 | Les Johnson | 3000.00 |
| 11/21/88 | Les Johnson | 1000.00 |
| | TOTAL | $ 57674.50 |

This total does not include $160 for a well permit, $528.92 for a school board tax, and $5,300 to Prate Roofing, all of which was paid by the Ottingers. Moreover, the total reflects a credit of $157.77 for returned material, and other expenditures for returned material was credited against the amount owed to Wolohan Lumber. The total of $57,674.50 was only the sum of monies expended on the project; it did not include approximately $13,000 in expenses incurred by Mor-Wood which had not yet been paid.

Craig Ottinger presented copies of various checks, invoices and receipts incurred in the process of completing construction on the house. Ottinger claimed that these costs totaled $157,864.59, plus an additional $4,500 in rent expense paid after February 1, 1988, during the home's construction.

At the close of Mor-Wood's case, the trial court dismissed count I of Mor-Wood's complaint seeking foreclosure of its mechanic's lien for failure to comply with the Mechanics' Liens Act (Ill. Rev. Stat. 1987, ch. 82, par. 1 *et seq.*). After the close of all evidence, the trial court made the following findings which are relevant here:

"3) Plaintiff's work up to the posting of the stop work order on or about November 17, 1987 was done in a good workmanlike fashion and in substantial compliance with the contract.

4) The septic field problem which precipitated the stop work

order was not a substantial defect or departure from the contract such that Plaintiff was in default thereof, or such that Defendant thereby had cause to terminate the contract.

5) Defendant's clear intent by his attorney's letter to Plaintiff's attorney on or about the 18th of November, 1987 (Plaintiff's Exhibit No. 16) was to terminate Plaintiff from the job.

6) Plaintiff failed to preserve its rights to claim wrongful termination by failing to bring itself within Sec. 5 of the Illinois Mechanics [sic] Lien [sic] Law.

7) Plaintiff's removal of tools and building materials from the job site [sic] in the face of Defendant's termination letter (Plaintiff's Exhibit No. 16) operates as a rescission of the contract.

8) Defendant would be unjustly enriched if allowed to keep Plaintiff's work without compensation to Plaintiff.

9) There is adequate evidence in the record to support an award to Plaintiff of the reasonable value of the work performed by referring to the contract price, the testimony of George Carlberg that the house was basically well-constructed, had 75% of rough work and ⅓ of total carpentry work done, but no electricity and only minor heating and plumbing work done, and the testimony of Gloria Morvay as to what bills had been paid. The reasonable value of Plaintiff's work up to November 18, 1987 is $57,674.60.

10) Defendant is entitled to credits of $27,504 [for payments already made to Mor-Wood].

11) Judgement should enter for Plaintiff in the amount of $30,170.50."

The court so entered judgment on count III of Mor-Wood's complaint and dismissed all other counts and the counterclaim. Mor-Wood filed a motion seeking to increase the award of damages based on the omission of approximately $13,000 in pending bills, but this motion was withdrawn on November 22, 1989. The Ottingers then filed this appeal.

The first argument raised on appeal by the Ottingers is that the November 18, 1987, letter sent by their attorney, Rochell, to Mor-Wood's attorney, Ament, did not constitute either a termination of Mor-Wood or a rescission of the contract. The trial court apparently focused on Rochell's demand that Mor-Wood "stop any further work at the project site" and the statement that "recission [sic] of the contract would be in [Mor-Wood's] best interests." The Ottingers, on the other hand, focus on the closing line of the letter, which states that Rochell would be "happy to discuss this further." The Ottingers contend that

the plain language of the letter does not indicate that they intended to terminate Mor-Wood or rescind the contract.

The letter makes it clear that the Ottingers' demand that Mor-Wood cease work on the project was made pursuant to article 20 of the contract. This provision deals with "TERMINATION OF THE CONTRACT." The Ottingers argue, however, that while section 20.2 does deal with termination, it also separately empowered the Ottingers to "make good" deficiencies in Mor-Wood's work. Thus, the Ottingers contend, Rochell's letter was merely notifying Mor-Wood that the Ottingers would exercise this right under the contract.

██ This interpretation of Rochell's letter is untenable for two reasons. First, some of the defects noted in Rochell's letter pertained to Mor-Wood's failure to provide the Ottingers with subcontractors' affidavits, a deficiency the Ottingers could not "make good" themselves. Second, the letter never expressed the Ottingers' intention to "make good" any deficiencies in Mor-Wood's performance. Instead, the letter demanded that Mor-Wood stop work completely, a demand which is more consistent with outright termination. If the Ottingers had merely wished to order Mor-Wood to cease work while deficiencies in its performance were remedied, then they could have done so pursuant to section 9.4 without terminating the contract. We believe that the reference to article 20 of the contract can only be interpreted as a reference to the Ottingers' authority to terminate the contract, and so we believe that the trial court correctly determined that Rochell's letter constituted an attempt to terminate the contract on behalf of the Ottingers.

The Ottingers argue that we must determine the intent of Rochell's letter with reference only to the plain words expressed therein and without examining the other testimony presented. As noted above, we believe that the words of the letter evidence an attempt to terminate the contract. Therefore, it is unnecessary to consider the other evidence.

The legal ramifications of this termination are clouded by the fact that the count of Mor-Wood's complaint seeking damages for wrongful termination was unsuccessful because of Mor-Wood's failure to comply with the Mechanics' Liens Act. As a result, the issue here is not whether termination was proper. The issue, which arises in the context of the Ottingers' counterclaim, is whether Mor-Wood breached the contract. The Ottingers frame the issue as one of whether Mor-Wood "abandoned" the contract as opposed to the trial court's finding of a rescission thereof.

 Generally, rescission means the cancelling of a contract so as to restore the parties to their initial status. (*Puskar v. Hughes* (1989),

179 Ill. App. 3d 522, 528, 533 N.E.2d 962, 966.) Rescission can arise in two settings. First, rescission of a contract can occur by mutual agreement of the parties. (*Chicago Limousine Service, Inc. v. Hartigan Cadillac, Inc.* (1989), 191 Ill. App. 3d 886, 896, 548 N.E.2d 386, 391.) Second, rescission is also an equitable remedy which can be afforded to one party under a contract because of the other party's fraud (*Douglass v. Wones* (1983), 120 Ill. App. 3d 36, 47-48, 458 N.E.2d 514, 523) or substantial nonperformance or breach (*Eager v. Berke* (1957), 11 Ill. 2d 50, 54, 142 N.E.2d 36, 38-39). A party seeking rescission must restore the other party to the status quo existing at the time the contract was made. *Puskar*, 179 Ill. App. 3d at 528, 533 N.E.2d at 966.

Although the terms "abandonment" and "rescission" are sometimes used interchangeably (see *Kalman v. Bertacchi* (1980), 80 Ill. App. 3d 530, 533, 400 N.E.2d 507, 510), it has been stated that a distinction should be drawn:

> "Where, upon a material breach by one party, the other party treats the breach as total by refusing to perform further and by maintaining an action for damages for such total breach, he is said to abandon further performance, but such abandonment is not technically a rescission of the contract, but a mere acceptance of a situation created by the wrongdoing of the adverse party." 17 Am. Jur. 2d *Contracts* §484 (1964).

In the instant case, the Ottingers' use of the word "abandonment" appears to mean *unilateral* abandonment or, in other words, a breach of Mor-Wood's obligation to perform under the contract. The Ottingers argue that Mor-Wood's removal of equipment from the jobsite and the failure to return constitutes "abandonment" or a breach of the contract. The trial court, on the other hand, found that the Ottingers' termination of Mor-Wood by the November 18 letter, combined with Mor-Wood's evacuation of the jobsite, effectuated a rescission of the contract.

▄▆ The trial court's determination is supported by the record. As noted above, the Ottingers terminated Mor-Wood and demanded that Mor-Wood stop working on the project. The letter from the Ottingers' attorney went so far as to suggest that rescission would be in Mor-Wood's best interests. This alone cannot constitute rescission, however, because cancellation or rescission of a contract by mutual consent requires more than the mere communication of intent from one party to another. (See *Copley v. Pekin Insurance Co.* (1986), 111 Ill. 2d 76, 86, 488 N.E.2d 1004, 1009.) The Illinois Supreme Court has stated:

> "Although one party to a contract may not alone rescind it, he may, nevertheless, by neglecting or refusing to perform it on his

part, place it in the power of the other party, where he is not also derelict, to avoid it, or not, at his pleasure. The breach of one party may, in such case, be treated by the other as an abandonment of the contract, authorizing him, if he choose to do so, to disaffirm it; and thus, the assent of both parties to the rescission of the contract is sufficiently manifested \*\*\*." *Bannister v. Read* (1844), 6 Ill. 92, 99-100.

■ Thus, based on the trial court's finding that Mor-Wood did not breach the contract, if any party here abandoned the contract, it was the Ottingers. In any event, it is clear that the trial court correctly determined that the contract was rescinded. A proposal to rescind may become binding if it is accepted before it is withdrawn (see 17 Am. Jur. 2d *Contracts* §490 (1964)), and rescission of a contract can be implied from the course of the parties' conduct (see *Kalman*, 80 Ill. App. 3d at 533, 400 N.E.2d at 510). Here, the trial court found that Mor-Wood's decision to leave the jobsite after receiving the termination letter from the Ottingers' attorney constituted an effective rescission of the contract. The evidence presented at trial amply supports this conclusion.

■ Mor-Wood elected to treat the contract as rescinded and to seek recovery under *quantum meruit* for the reasonable value of the services it performed for the Ottingers before the contract was rescinded. Where one party repudiates a contract and refuses to be bound by it, the injured party may treat the contract as rescinded and recover upon *quantum meruit* so far as he has performed. (*Lake Shore & Michigan Southern Ry. Co. v. Richards* (1894), 152 Ill. 59, 80, 38 N.E. 773.) Here, the rescission at issue was mutual, so there is no injured party *per se* as there might be in the case of a breached contract. However, "[w]here one of the parties to a contract, while the contract is still executory, directs the other not to proceed further with the performance thereof, the latter may bring an action for damages for the breach of the contract or an action upon quantum meruit for the value of the services rendered and any materials furnished." (17 Am. Jur. 2d *Contracts* §519 (1964).) Thus, the trial court correctly determined that Mor-Wood could recover under *quantum meruit*.

■ The Ottingers' second argument deals with the proper amount of Mor-Wood's recovery. The proper measure of recovery under *quantum meruit* is the reasonable value of plaintiff's services. (*Ellis v. Photo America Corp.* (1983), 113 Ill. App. 3d 493, 500, 447 N.E.2d 852, 857.) The Ottingers contend that Mor-Wood did not present sufficient evidence of reasonable value. We disagree for three reasons.

■ First, Gloria Morvay, Mor-Wood's bookkeeper, testified regarding expenditures made by Mor-Wood on the Ottinger project, and the

portion of the ledger containing entries of these expenditures was introduced into evidence. This evidence, which was not objected to by the Ottingers, quantifies the expenditures made by Mor-Wood on the project. If anything, the $57,674.50 amount reflected in the ledger understates Mor-Wood's total expenses for the project because it represents only those expenses already paid but not those which were yet to be paid. Uncontroverted testimony under oath regarding amounts paid is properly admissible as proof of damages (*Saunders v. Wilson* (1969), 114 Ill. App. 2d 380, 382, 253 N.E.2d 89), and where such testimony is not inherently improbable it cannot be disregarded (*Elliot v. Villa Park Trust & Savings Bank* (1978), 63 Ill. App. 3d 714, 717, 380 N.E.2d 507, 510).

■ Second, George Carlberg, the contractor who completed the project, testified that Mor-Wood's work was "well constructed" and approximately one-third complete. Consideration of the workmanlike manner of construction is proper when determining the amount of a *quantum meruit* award. See *Hirz v. Lee* (1965), 64 Ill. App. 2d 455, 212 N.E.2d 498 (abstract of opinion).

■ Finally, the fact that Mor-Wood expended an amount approximately equal to one-third of the contract price to complete one-third of the construction provides an objective indication of the reasonableness of the *quantum meruit* award. Reference to contractual terms is not an improper method of measuring the reasonable value of a plaintiff's services for purposes of an award under *quantum meruit*. (See *Ellis*, 113 Ill. App. 3d at 500-01, 447 N.E.2d at 857.) The determination of what constitutes a reasonable award under *quantum meruit* may be difficult and often depends upon the peculiar facts of the individual case. (*Elliot*, 63 Ill. App. 3d at 717-18, 507 N.E.2d at 510.) The finding of a trial court, sitting without a jury, as to damages will not be disturbed on review unless it is manifestly erroneous. (*Poeta v. Sheridan Point Shopping Plaza Partnership* (1990), 195 Ill. App. 3d 852, 858, 552 N.E.2d 1248, 1252.) We do not believe that the trial court's finding with regard to the reasonable value of Mor-Wood's services is manifestly erroneous.

We note that the Ottingers also appear to argue in a one-paragraph statement in their brief that the award under *quantum meruit* should not include the services of Lake-Cook Trenching and Ryan Excavating because these expenditures paid by Mor-Wood caused some of the problems with the septic system leading to the stop-work order. This contention is meritless because the trial court, faced with conflicting evidence as to whether this work was done at Craig Ottinger's own direction, found that Mor-Wood was entitled to recover the value of

these services.

■■ The Ottingers' next contention is that the trial court erred by failing to apply the "actual cost" measure of recovery, which would allow the Ottingers to recover under their counterclaim for the actual cost of expenditures they made in completing construction of the home. However, the trial court found that Mor-Wood's work on the project prior to the posting of the stop-work order was performed in a good, workmanlike manner and that the problem with the septic field did not constitute a breach on Mor-Wood's part. Thus, the court clearly determined that the Ottingers could not recover for breach of contract and awarded the Ottingers *no* damages. Having failed to establish a *basis* for recovery on their counterclaim, the Ottingers' argument regarding the proper *measure* of recovery is irrelevant.

Finally, the Ottingers maintain that the trial court's computation of damages failed to account for credits due the Ottingers for unused and returned materials ($5,940.62) and a roofing bill which was actually paid by the Ottingers ($5,300). The Ottingers correctly note that the trial court's calculation of the reasonable value of Mor-Wood's services began with the amount of $57,674.50, which is the total of Mor-Wood's expenditures on the Ottinger project as evidenced by the ledger and the testimony of Gloria Morvay. The Ottingers apparently assume that this amount improperly reflects the expenditures noted above, and they ask us to reduce Mor-Wood's award accordingly.

■■ As demonstrated in the calculations made above, however, the $57,674.50 total *does not* reflect any of the items which the Ottingers assume it does. Credits for returned materials were either deducted from the calculation of expenditures or credited against the amounts owed to various subcontractors or suppliers arising out of the Ottinger project. There is no support whatsoever in the record to support the Ottingers' argument that they were not properly credited for expenditures made by them or for materials which were ultimately returned by Mor-Wood.

The judgment of the circuit court is, therefore, affirmed.

Affirmed.

WOODWARD and DUNN, JJ., concur.