In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1598

FIDELITY AND DEPOSIT COMPANY OF MARYLAND and
  AMERICAN HOME ASSURANCE COMPANY,

*Plaintiffs-Appellants*,

*v.*

ROTEC INDUSTRIES, INC.,

*Defendant-Appellee*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 5829—**William J. Hibbler**, *Judge*.

———————

ARGUED NOVEMBER 9, 2004—DECIDED DECEMBER 28, 2004

———————

Before FLAUM, *Chief Judge*, and CUDAHY and POSNER,
*Circuit Judges*.

POSNER, *Circuit Judge*.  The appeal in this diversity suit
governed by Illinois law requires us to examine a doctrine
of contract law known as "divisibility." Rotec, the defen-
dant, had a contract with Guy F. Atkinson Construction
Company relating to China's damming of the Yangtze
River—the $25 billion "Three Gorges" project that is due to
be completed in 2009. Soon after the contract was signed,
Atkinson declared bankruptcy and, as debtor in possession,

rejected (with immaterial exceptions) its executory contracts, pursuant to 11 U.S.C. § 365(a). The plaintiffs, a pair of insurance companies, bought Atkinson's contract rights, including its rights under the contract with Rotec, and then filed this suit against Rotec for breach of contract. Rotec argued, and the district judge, granting summary judgment in its favor, agreed, that the contract was executory, and so, having been rejected, and thus terminated, by Atkinson, could not have been acquired by the plaintiffs—there was nothing to acquire—and so they had no basis for their suit.

But what if, as the plaintiffs argued unsuccessfully to the district court, the contract was divisible into two parts and the first, having been fully executed by Atkinson, had not been rejected when Atkinson rejected its executory contracts? Then it would be as if there were two separate contracts, one performed, one executory, with only the second having been rejected in bankruptcy and the first having passed to the plaintiffs in the sale to them of Atkinson's contract rights. *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741-42 (5th Cir. 1996) (per curiam); *Monument Square Associates, Inc. v. Resolution Trust Corp.*, 792 F. Supp. 874, 876-77 (D. Mass. 1991); cf. *In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir. 1987). But is "as if" enough? The parties assume so, with support in the cases we've cited plus *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994) (per curiam), cases that rely on a dictum in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6 (1984), based in turn on some scanty legislative history to section 365(a). And yet divisible contract is not two (or more) separate contracts; if it's broken, it's broken entirely. The only significance of its divisibility is that the contract price will be used to determine the value of any partial performance of the contract. *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 730 N.E.2d 1143, 1148 (Ill. App. 2000);

*Metropolitan Trust Co. v. Fishman*, 55 N.E.2d 837, 839-40 (Ill. App. 1944); *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 94 Cal. Rptr. 2d 438, 444 (App. 2000); *Restatement (Second) of Contracts* § 240 and comment b (1981). But we'll allow the parties their assumption that the plaintiffs should win if there is divisibility, and save our doubts for a future case.

The first document Rotec and Atkinson signed was a memorandum of understanding in January 1996. It states that the Chinese corporation responsible for the Three Gorges project has requested bids for dam-construction machinery, that Rotec intends to bid for the contract, that Atkinson will be a subcontractor of Rotec, that Atkinson and Rotec possess "complementary technology, products, know-how . . . [etc.] which, taken together, would allow the Parties to perform the Project according to the highest international standards," and that the parties' objective is "to cooperate in preparing a proposal for submission" to the Chinese "to obtain the award of a contract" and "take all other actions necessary to performance thereunder, including entering into . . . Performance Agreement(s) for the performance of the Project and any other agreements necessary to the successful performance of the Project."

The following month the parties signed a supplement to the memorandum of understanding in which they "agreed that Atkinson shall be paid a fee by Rotec for the use of its name by Rotec with respect to the Project." The fee was to be between $2 million and $3 million, the exact amount being left to negotiation between the parties. Rotec also agreed to pay Atkinson another $1 million for "its involvement in the Project. Such involvement shall include providing advice and technical support services under subcontract to Rotec in connection with Rotec's performance under the Contract."

Rotec submitted its bid, and in the fall of 1996 won a $30 million contract. Eight months later, Rotec and Atkinson signed another supplement to their memorandum of understanding. This supplement modified the preceding one by specifying that Atkinson would receive $1 million (rather than $2 to $3 million) for having permitted its name to be used in winning the initial $30 million contract with the Chinese and that if Rotec succeeded in enlarging the contract to cover an additional $15 million in equipment sales, Atkinson would receive a 5 percent fee on those sales. This supplement further states that "Atkinson is keen and willing to help ROTEC increase the size of the order of equipment and to participate in the site operations (erection, and commissioning etc.)."

A few days after the execution of the second supplement, Rotec sent Atkinson a check for $129,000 in partial payment of the $1 million fee for the use of Atkinson's name. Three weeks later, Atkinson declared bankruptcy and walked away from the parties' contract, which by this time consisted of the memorandum of understanding plus the two supplements.

Atkinson (which for the sake of simplicity we'll pretend is the plaintiff, rather than the insurance companies that purchased its contract rights) argues that the "Project" to which its tripartite contract with Rotec refers was just the preparation of the bid for which it was to receive $1 million plus 5 percent of any additional orders by the Chinese. And, the argument continues, that divisible contract segment was fully performed by Atkinson when the bid was accepted, thus entitling Atkinson to $1 million plus the 5 percent fee for subsequent orders—and there *were* subsequent orders, as a result of which Atkinson claims to be out not just the $1 million fee for its name (minus the $129,000 that it received)

but almost $1.3 million more. Rotec ripostes that there was a single, indivisible contract that required Atkinson to cooperate with Rotec not only in the preparation of the bid but also in providing services relating to the construction of the dam in the event that the bid was accepted, as it was. Atkinson broke the contract when upon declaring bankruptcy it withdrew from the dam project, and this breach excused Rotec from further performance on its side—that is, from having to complete payment of the $1 million "name" fee and to pay in addition the 5 percent fee on the additional orders by the Chinese.

Atkinson would nevertheless be entitled to claim compensation in a suit for quantum meruit for the value of the services that it had rendered to Rotec before the breach, minus any damages that Rotec suffered from the breach. *Fieldcrest Builders, Inc. v. Antonucci*, 724 N.E.2d 49, 60 (Ill. App. 1999); *Evans & Associates, Inc. v. Dyer*, 615 N.E.2d 770, 778 (Ill. App. 1993); *Micro Data Base Systems, Inc. v. Dharma Systems, Inc.*, 148 F.3d 649, 656 (7th Cir. 1998); *Kutzin v. Pirnie*, 591 A.2d 932, 937-41 (N.J. 1991); *Restatement*, *supra*, § 374(1) and comment a. So whether a great deal turns on a finding of divisibility is doubtful; that is so in general, and would be in this case as well were it not for Atkinson's rejection of the contract in bankruptcy. If the contract was divisible, Atkinson was entitled to the contract price for the divisible portion of its performance that it completed. If not, it was entitled to the value of its performance and a court would look to the contract price as a guide to that value, *Mor-Wood Contractors, Inc. v. Ottinger*, 562 N.E.2d 1247, 1255 (Ill. App. 1990); *Newfield House, Inc. v. Massachusetts Dept. of Public Welfare*, 651 F.2d 32, 39 (1st Cir. 1981); *Constantino v. American S/T Achilles*, 580 F.2d 121, 122-23 (4th Cir. 1978); *Restatement*, *supra*, § 374 comment b; E. Allen Farnsworth, *Contracts* § 8.14, p. 560 (4th ed. 2004), especially in a case such as this in which there is no readily ascertain-

able market price to which it could look instead. *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 730 (2d Cir. 1992).

There is greater definiteness when the contract price provides not merely a guide, but the definitive specification of the performing party's entitlement; that presumably is the reason for the doctrine of divisibility. But what is really involved is the exchange of one uncertainty, that of the value of performance, for another, that of deciding divisibility—of deciding, that is, whether "both parties have divided up their performance into units or installments in such a way that each past performance is the rough compensation for a corresponding past performance by the other party. The test is whether, had the parties thought of it, they would be willing to exchange the part performance irrespective of what transpired subsequently or whether the divisions made are merely for the purpose of requiring periodic payments as the work progresses." *Trapkus v. Edstrom's Inc.*, 489 N.E.2d 340, 346 (Ill. App. 1986); see also *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc., supra*, 730 N.E.2d at 1148-49. Maybe on balance the doctrine increases certainty—or maybe not, when we consider the following language from the *Trapkus* opinion: "whether it is proper to regard the parts of each pair as agreed equivalents will usually depend on considerations of fairness. This means that the parts of the pair must be of roughly equivalent value to the injured party in terms of his expectations with respect to the total agreed exchange." 489 N.E.2d at 346; see also *Restatement, supra*, § 240 comment e; Farnsworth, *supra*, § 8.13, pp. 554-55.

Because the application of the doctrine depends on evidence of "agreed equivalents," the use of the contract price to determine entitlements when the contract has not been fully performed is defensible only when the

contract itself can be said to specify the price for partial performance. See 5 Arthur Linton Corbin, *Corbin on Contracts* § 1111 (1964). That condition will rarely be satisfied. If an employment contract is for a year and the employee quits after his first week on the job, it is artificial to suppose that the contract entitles him to one week's wages, for had he insisted in the contract negotiations that he be free to leave after a week the employer would probably have refused to hire him at all, or at least at the agreed wage. *Id*. The fact that many courts nevertheless treat employment contracts as divisible probably has less to do with the logic of the doctrine than with a policy, embodied in state wage-payment laws, e.g., Cal. Labor Code § 204; Del. Code tit. 19 § 1102; 820 ILCS 115/3; Ind. Code § 22-2-5-1; Mich. Comp. Laws § 408.472; N.J. Stat. 34:11-4.2; N.Y. Labor Law § 191; Ohio Rev. Code § 4113.15; 43 Pa. Cons. Stat. § 260.3; Tex. Labor Code § 61.011, of protecting wage earners.

Setting the employment cases to one side as inapplicable to the type of contract involved in the present case, we think the district judge was correct to hold the contract indivisible. Atkinson's argument that the term "project" refers only to the bid preparation offends language and common sense. Not that the service rendered by Atkinson at the bidding stage in lending its prestigious name to Rotec's proposal was trivial. At least until its plunge into bankruptcy, Atkinson was an illustrious dam builder. Founded in 1926, it had been involved in the construction of the Bonneville and Grand Coulee dams and of the Guri dam in Venezuela and in many other major projects, including an underground excavation in New Jersey in which it moved 12 million cubic tons of rock. Its signature on the bid certified that Rotec was competent to perform the contract if its bid was accepted. Atkinson also helped Rotec prepare the proposal.

But the contract contemplated more. Representations were made to the Chinese in connection with the bid that implied that Atkinson would remain active in the performance phase of the contract should the contract be awarded to Rotec. The cover letter of the bid is signed by both companies, states that "Rotec intends to submit to the Three Gorges Corporation a bid, with Atkinson and Mitsui as subcontractors," and concludes by stating that "their"—not its—"commitment to the Yangtze Three Gorges Project will be no less than their past commitment to the international construction field." The use of the future tense signals an intention by Atkinson to remain involved in Rotec's piece of the dam project after the bid is accepted. Also telling is Rotec's agreeing to pay Atkinson $1 million (over and above the $2 to $3 million "name" fee) for "its involvement in the Project. Such involvement shall include providing advice and technical support services under subcontract to Rotec in connection with Rotec's performance under the Contract." The reference to "Project" is clearly to the performance stage of Rotec's contract with the Chinese rather than to the bid-submission stage.

It is true that the details of Atkinson's participation at the performance stage were left undefined. But we do not understand Atkinson to be arguing that its "commitment" was so vague that if the day after the bid was accepted it had told Rotec that it was quitting now and wanted its $1 million and its 5 percent (if and when additional orders were submitted to Rotec), that would not have been a breach. Such a defection would have left Rotec high and dry, deprived of necessary advice and assistance. It might have jeopardized Rotec's relations with the Chinese, who might think Rotec had deliberately misled them into believing that Atkinson would participate in the project. Atkinson's name was valuable to the Chinese and hence to Rotec—but only if the name connoted participation

beyond the bestowal of a Good Housekeeping seal of approval. And so we are persuaded that "it is impossible to affirm that [Rotec] would have assented to any part [of the contract] unless [it] assented to all." *Trapkus v. Edstrom's Inc.*, *supra*, 489 N.E.2d at 347; see also *Gladstone v. McHenry Medical Group*, 553 N.E.2d 1174, 1179-81 (Ill. App. 1990); *Klubeck v. Division Medical X-Ray, Inc.*, 439 N.E.2d 506, 510-11 (Ill. App. 1982).

But Atkinson, noting that the district court decided the case for Rotec on summary judgment, tells us that the question whether a contract is divisible is one of fact, not of law, and so there must be a trial. *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 538 (Ill. App. 2000), on which Atkinson relies, so holds, but *Trapkus v. Edstrom's Inc.*, *supra*, 489 N.E.2d at 344-45, leans the other way, leaving us uncertain what the rule in Illinois should be taken to be. The cases from other jurisdictions are split. Compare *Equity Control Associates, Ltd. v. Root*, 638 N.E.2d 664, 671 (Iowa 2001); *Carvel Co. v. Spencer Press, Inc.*, 708 A.2d 1033, 1035 (Me. 1998); *Magic Valley Radiology Associates, P.A. v. Professional Business Services, Inc.*, 808 P.2d 1303, 1312 (Idaho 1991), and *Ellison v. Tubb*, 749 S.W.2d 650, 651 (Ark. 1988), all of which deem it an issue of fact, with *Estate Landscape & Snow Removal Specialists, Inc. v. Mountain States Telephone & Telegraph Co.*, 844 P.2d 322, 328 (Utah 1992); *Sisk v. Parker*, 469 S.W.2d 727, 732 (Tex. App. 1971); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 674-75 (6th Cir. 2003) (Ohio law), and *Harris v. Dial Corp.*, 954 F.2d 990, 993 n. 2 (4th Cir. 1992) (Arizona law), which deem it one of law.

None of the cases contains an illuminating discussion of the choice; and the parties to the present case have overlooked the decisions of this court that hold, in con-

formity with decisions of the Supreme Court beginning with *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525 (1958), that in *all* cases in federal court, including diversity cases, the allocation of responsibility between judge ("law") and jury ("fact") is governed by federal rather than state law. *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 333 (7th Cir. 1994); *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir. 1993); *Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 199-201 (7th Cir. 1992); *Binakonsky v. Ford Motor Co.*, 133 F.3d 281, 290 (4th Cir. 1998); *Villarini-Garcia v. Hospital Del Maestro, Inc.*, 8 F.3d 81, 86 (1st Cir. 1993). The practical consideration behind these cases is that the allocation depends on the relative capabilities of judges and jurors and of trial and appellate courts, and on other factors specific to a particular court system, including rules of evidence and procedure, rather than on policies rooted in substantive state law, which under the *Erie* doctrine supplies the rules of decision in diversity cases. The line frays, however, when the procedural rule is generated by a substantive policy; and it is possible to view the fact-law distinction in contract cases in that light, as designed to reduce contractual transaction costs by allowing most contract disputes to be resolved without a trial. Cf. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364-65 (7th Cir. 1990). The rule that the meaning of a written contract is an issue of law if no evidence besides the contract itself is presented is such a rule, and a rule determining whether divisibility is to be deemed a legal or a factual question could be thought a corollary of that rule.

We need not pursue the matter in this, or perhaps in any, case, as there is less to the division of authority on the issue than meets the eye. To spare contracting parties the expense and uncertainty and other angst of trial, courts endeavor, as we have just noted, to resolve contract disputes on the basis

of the language of the contract, supplemented by commercial or common sense—hence as a "question of law," which just means that it is to be answered without a trial. When the courts can't do this because the language and circumstances fail to dispel ambiguity, they say the contract presents a question of fact, meaning that there has to be a trial. There is no reason why this approach shouldn't serve when the question is whether a contract is divisible. See *L.U. Cattle & Co. v. Wilson*, 714 P.2d 1344, 1349 (Colo. App. 1986).

No trial is necessary here in any event, if only because Atkinson has failed to indicate what if any evidence it might wish to present at a trial, beyond the documents constituting the contract, that would bear on the issue of divisibility. All the pertinent evidence is thus before us and as it supports only one conclusion—that of indivisibility—there is no occasion for a trial.

The judgment in Rotec's favor is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*