SECOND DIVISION

June 27, 2000

No.  1-99-2478

QUALITY COMPONENTS CORPORATION,     )

WILLIAM H. GUCKIEN, AND )

WALLY STONEHAM, ) Appeal from the

) Circuit Court of

Defendants-Appellants- ) Cook County.

Cross-Appellees, )

)

v. ) 

) 

KEL-KEEF ENTERPRISES, INC., )

AND ROBERT J. FLECK ) Honorable

) Jennifer Duncan-Brice,

Plaintiffs-Appellees- ) Judge Presiding.

Cross-Appellants.    ) 

JUSTICE GORDON delivered the opinion of the Court:

BACKGROUND FACTS

This litigation is a consolidated action which arose out of a transaction for the sale of a business which sold replacement parts for printing presses.  This action consists of two suits, the first one brought in the chancery division by plaintiff Robert Fleck against Quality Components, Wally Stoneham and William Guckien for payment of money owed to him under a non-

competition agreement between him and Quality and guaranteed by Stoneham and Guckien, and by plaintiff Kel-Keef for payment on a promissory note between it and Quality and guaranteed by Stoneham and Guckien for the assets of the business which Kel-Keef sold to Quality pursuant to a purchase agreement.  The second lawsuit was brought in the law division against Fleck and Kel-Keef by Quality for breach of those same agreements.

At the trial William Stoneham testified for Quality Components Corporation ("QCC II") that he began working for a company known as DEV Industries ("DEV") in 1984 as a salesman.  DEV was in the business of selling replacement parts for printing presses.  DEV did not manufacture the parts, but kept blueprints numbering in the hundreds or thousands for all of the parts which it sold which it would then job out to machine shops to fabricate the parts which its customers requested.  While working at DEV Stoneham became aware of a lawsuit (the "Rockwell I" litigation) that was brought in federal court against DEV by Rockwell Graphics ("Rockwell") which claimed the ownership to certain of these blueprints.  In 1988 defendant Robert Fleck ("Fleck") purchased the replacement parts division of DEV (for which Stoneham worked) and named the new company Quality Components Corporation ("QCC I").  Fleck had previously been president of DEV and was one of its four shareholders.  Stoneham became an employee of the new company (QCC I) and helped move the drawers of blueprints from DEV to QCC I.  

In 1989 Stoneham and William Guckien ("Guckien") began negotiations with Fleck to purchase the assets of QCC I.  During the negotiations, Stoneham had several discussions with Fleck regarding the Rockwell I litigation.  Fleck told Stoneham that none of the blueprints which QCC I possessed were involved in the Rockwell lawsuit.  Stoneham and Guckien set up a corporation (later identified as Components Holdings Inc. ("CHI")) to purchase the assets of QCC I.  After it acquired the assets of QCC I, CHI adopted the name of the vendor Quality Components Corporation (QCC II).  After the sale of its assets to QCC II, QCC I changed its name to Kel-Keef Enterprises, Inc. ("Kel-

Keef").

In 1991 QCC II was joined as a defendant in a lawsuit brought in Cook County circuit court (No. 91 CH 01011) by Rockwell (the "Rockwell II" litigation), which also named DEV and Fleck.  The lawsuit was related to the Rockwell I litigation against DEV, alleging that QCC II had blueprints which belonged to Rockwell.  There was no list attached to Rockwell's suit papers identifying the blueprints which the lawsuit related to, but Fleck sent Stoneham a list of the blueprints which were at issue in the first lawsuit against DEV from which Stoneham determined that 53 of the blueprints which QCC II had acquired from QCC I were in fact claimed by Rockwell in its lawsuit.  QCC II thereupon settled the Rockwell II litigation against it in 1993 pursuant to which QCC II gave up to Rockwell the 53 blueprints which Rockwell claimed from it in that lawsuit. Stoneham further averred that on the advice of their attorney, Stoneham and Guckien decided to stop making payments to Fleck pursuant to the non-competition agreement and to Kel-Keef pursuant to the purchase agreement.

Deborah Ruff testified in rebuttal for QCC II that she is an attorney who represented Rockwell in several lawsuits against Fleck, DEV, QCC II and other parties pursuant to Rockwell's allegations that those parties possessed or misappropriated Rockwell's blueprints.  Ruff testified that the first case, Rockwell I, was filed in federal court in 1984 against Fleck and DEV.  In 1991 Rockwell initiated the Rockwell II litigation in state court against DEV, Fleck and QCC II.  QCC and Rockwell settled the Rockwell II case for $3,300.00.  The third Rockwell case (the "Rockwell III" litigation) was filed in federal court in 1992 against Fleck. 

It is not in dispute that in 1989 the federal magistrate in the Rockwell I litigation found in favor of Fleck and that decision was later overturned by the Seventh Circuit.  The Rockwell I litigation ultimately ended with an injunction being entered against Fleck in 1993.  The Rockwell III litigation also ended against Fleck in 1993 when Fleck signed a consent decree to settle the litigation in which he admitted misappropriating trade secrets from Rockwell.

William Guckien testified for QCC II that he and Stoneham purchased the assets of QCC I from Fleck.  The purchase included the blueprints for the replacement parts which QCC I sold, and Guckien averred that those blueprints were of critical importance to the business.  After QCC II settled the Rockwell II litigation, it was no longer able to use the 53 blueprints which Rockwell had claimed.  As a consequence, QCC II could no longer obtain the parts described by those blueprints at competitive prices.  Thus, according to Guckien, QCC II was not able to effectively compete with other companies in the replacement parts business and it was resultantly forced to shut down.  QCC II ceased making payments owed to Fleck and Kel-Keef on the purchase agreement and the non-competition agreement because Fleck had admitted in a consent decree pursuant to the Rockwell III litigation that he had obtained the blueprints illegally.  Fleck and Kel-Keef then sued QCC II in chancery demanding payment pursuant to the purchase and non-competition agreements.  QCC II responded by suing Fleck and Kel-Keef at law for breach of contract and fraud.

Mark Bischoff testified for Kel-Keef that he was the attorney who represented Fleck and QCC I during the sale of QCC I's assets to Stoneham and Guckien's company, CHI.  Bischoff testified that he told the buyers about the Rockwell I litigation; that Fleck and QCC I did not want to make any representations concerning it; and that they should look into that litigation.  Bischoff further stated that the buyers were encouraged to contact the attorneys for Rockwell.  At one point in the negotiations, the attorney for the buyers asked for an indemnification agreement which would hold Fleck and DEV responsible for any damages sustained by QCC II as a result of the Rockwell litigation; however, Fleck refused to consent to such an indemnification agreement.  Bischoff averred that an attorney for the buyers (CHI) told him that they would "live with the Rockwell situation."  

Robert Fleck, the president of Kel-Keef, testified for Kel-

Keef.  Fleck averred that in 1989 he did not believe that he had misappropriated trade secrets from Rockwell.  He further stated that in 1989, on the day of the closing, the magistrate judge in the Rockwell I litigation found in his favor.  That ruling was later overturned on appeal, and Fleck identified an injunction which was entered against him pursuant to the Rockwell I litigation on July 26, 1993.  Fleck also identified a consent decree which he had signed on December 14, 1993, pursuant to the Rockwell III litigation.  In the consent decree Fleck admitted that while he was employed by DEV he utilized misappropriated blueprints and other Rockwell trade secrets for the benefit of DEV.  

The transaction for the sale of the assets of QCC I was accomplished through eleven documents, which Stoneham identified.  The relevant documents are summarized below.  CHI received a purchase agreement, a non-competition agreement and a bill of sale.  The Asset Purchase Agreement ("purchase agreement") between QCC I and CHI provides that the assets of QCC I will be sold to CHI in exchange for a total of $160,000 to be paid over five years.  Article IV of the purchase agreement is entitled "Representations and Warranties of Seller and of Fleck" and it contains a warranty of title stating that the seller has good, exclusive and marketable title to the sold assets, except as set forth in schedule 4.6 which does not list anything relevant to this appeal.  Article IV also states that the seller and Fleck have not knowingly made any statement which contains any untrue statement of material fact or omits a material fact.  Article VI is entitled "Post-Closing Matters" and it contains a section entitled "Survival of Representations and Warranties."  This section states that the representations and warranties set forth in the agreement will remain in full force and effect and shall survive the closing and the transfer of the assets for two years.

CHI also received a "Noncompetition Agreement" which was signed contemporaneously with the purchase agreement and provided that Fleck agreed not to compete with CHI for five years.  In consideration for this promise, the agreement provided that CHI would pay $125,000 to Fleck in five annual installments of $25,000 per year.

QCC I received several instruments, of which the relevant documents are summarized below.  The "Non Negotiable Promissory Note" provided for CHI to make payments to QCC I totaling $160,000 over five years pursuant to the sale effected by the purchase agreement and the bill of sale.  QCC I also received a "Guaranty" which provides that Guckien and Stoneham personally guaranty full and prompt payment of the promissory note and the non-competition agreement by CHI.

QCC I and Fleck also received a letter ("the side letter") from CHI and its president, Stoneham.  The letter states that the purchasers of the assets of QCC I have been fully informed about the lawsuit between Rockwell and DEV, and that the purchaser understands that QCC I is "making no representations or warranties with regard to this lawsuit."  The letter further states that in the event of any potential claims with regard to the lawsuit each party "shall be responsible for their respective claim."

The initial action in this consolidated case was filed in chancery by Kel-Keef and Fleck against QCC II, Guckien and Stoneham (the "chancery action").  The suit contained six counts.  Two counts, III and VI, were dismissed without prejudice before trial and are not relevant to this appeal.  In count I Kel-Keef sued QCC II for its alleged breach of the promissory note, and in count II Kel-Keef asked for enforcement of the personal guarantee of the promissory note against Guckien and Stoneham.  In count IV Fleck sued QCC II for breach of the non-competition agreement, and in count V Fleck asked for enforcement of the personal guarantee of the non-competition agreement.  The suit alleged breach by QCC II of the promissory note, breach of the non-

competition agreement, and asked for enforcement of the guaranty as against the individual sureties, and foreclosure on the secured assets.  QCC II later filed a separate suit at law (the "suit at law") against Kel-Keef and Fleck arising from QCC II's loss under the Rockwell II litigation.  Stoneham and Guckien were not parties to this suit.  The suit sought recovery against Kel-

Keef and Fleck on four counts.  Count III alleged violations of warranties pursuant to the uniform commercial code, and the court granted a directed verdict for Fleck and Kel-Keef on this count during trial.  Count IV alleged deceptive business practices and is not involved in this appeal.  Count I alleged fraud and it was ultimately submitted to the jury.  Count II alleged breach of contract.  A directed verdict was granted in favor of Fleck on count II, but count II was submitted to the jury as against Kel-

Keef.  The two cases were consolidated, and tried simultaneously. The chancery action was tried to the court, and the action at law was tried to the jury.

In the action at law the jury returned a verdict in favor of QCC II and against Kel-Keef on the breach of contract count and a verdict in favor of Kel-Keef and Fleck on the fraud count.  The jury awarded QCC II damages of $60,000.  In the chancery action the court initially found that Fleck (Kel-Keef)
(footnote: 1) had breached the purchase agreement and that the breach was material.  QCC II was thus excused from making payments under the purchase agreement and the promissory note.  The court found that the non-

competition agreement was a separate contract between QCC II and Fleck individually which had not been breached by the promisor, Fleck, and that QCC II was still obligated to make payments pursuant to it.  The court directed the parties to submit amended petitions for attorney fees.

Both sides filed motions to reconsider.  Kel-Keef argued that QCC II could not receive damages for breach of the purchase agreement and be excused from making further payments under the purchase agreement as that constituted a double recovery for QCC II.  Kel-Keef further argued that QCC II had elected the remedy of damages and therefore could not rescind the contract as rescission disaffirms the contract and is thus inconsistent with seeking a remedy of damages which affirms the contract.  On reconsideration the court agreed with Kel-Keef's position and entered its final judgement in light of the reconsideration on June 11, 1999.  The court entered judgement in the suit at law for QCC II and against Kel-Keef on count II (breach of contract) for $60,000.  The court entered judgement for Fleck on count II and for Fleck and Kel-Keef on count I.  In the chancery case the court entered judgement on counts I and II in favor of Kel-Keef and against QCC II, Stoneham and Guckien, jointly and severally. The court therefore found that Kel-Keef was entitled to recover for the purchase agreement in its chancery suit subject to a setoff of the jury's award of $60,000 damages in the suit at law and the award of $67,118.87 in attorney fees which the court awarded pursuant to the suit at law.  The court therefore found that QCC II was required to pay the remaining balance under the promissory note subject only to the two setoffs.  On counts IV and V the court entered judgement in favor of Fleck and against QCC II, Guckien and Stoneham. 

This appeal followed.  QCC II, Guckien and Stoneham appeal and Kel-Keef and Fleck cross-appeal from the court's entry of final judgement.  QCC II argues on appeal that the trial court erred as a matter of law in concluding that QCC II had elected the remedy of damages; that Kel-Keef's material breach of the contract excused QCC II from any further obligation to pay; that the non-competition agreement was part of a single contract for the sale of a business and Kel-Keef's breach of the purchase agreement thus also excuses QCC II from performing under the non-

competition agreement; that the trial court abused its discretion by excluding QCC II's proffered expert witness on damages; and that the trial court erred by excluding evidence about a lawsuit which existed at the time of the contract and was not disclosed by Kel-Keef.  On cross-appeal, Kel-Keef argues that the trial court erred in not granting its motion for a directed verdict on the breach of contract claim in the case at law; that there was insufficient evidence as to damages; and that QCC II is not entitled to attorney fees or costs.

ANALYSIS
(footnote: 2)
I.  QCC II'S APPEAL

A.  ELECTION OF REMEDIES

QCC II first argues that the trial court erred in holding that QCC II elected the remedy of damages for Kel-Keef's breach of the contract by suing for damages, even though final judgement had not yet been entered on QCC II's suit at law for damages.  QCC II concedes that it cannot both be excused from performance under the contract and receive damages as those remedies are inconsistent.  Damages affirm the contract, while the other remedy repudiates it; however, QCC II argues that it expressly elected to abandon its verdict for damages in the suit at law in favor of being excused from performance of the contract in the chancery suit.  Kel-Keef argues that QCC II elected damages as its remedy by filing the suit at law seeking damages, and that it was not necessary for the suit at law to be prosecuted to judgement for an election to occur. 

The general rule regarding election of remedies is well settled.  The doctrine of election of remedies "should be confined to cases where (1) double compensation of the plaintiff is threatened or (2) the defendant has actually been misled by the plaintiff's conduct or (3) res adjudicata can be applied."  
Faber, Coe & Gregg, Inc., v. First National Bank of Chicago
, 107 Ill. App. 2d 204, 211, 246 N.E.2d 96, 100 (1969).  Accord, 
International Association of Machinists & Aerospace Workers v. Industrial Commission
, 79 Ill. 2d 544, 550-51, 404 N.E.2d 787, 789 (1980).  In this case the trial court was presented with a situation where double compensation was threatened.  QCC II was initially both excused from performing under the purchase agreement and awarded damages for Kel-Keef's breach of the purchase agreement, and QCC II has conceded that these remedies are inconsistent.

 It is clear that the "prosecution of one remedial right to judgement or decree constitutes an election barring subsequent prosecution of inconsistent remedial rights."  
Majcher v. Laurel Motors, Inc.
, 287 Ill. App. 3d 719, 726, 680 N.E.2d 416, 421 (1997).  However, the question of whether a suit not prosecuted to judgement constitutes an election barring the plaintiff from an inconsistent remedy is less well settled.  See E.H. Schopler, Annotation, 
Conclusive Election of Remedies as Predicated on Commencement of Action, or its Prosecution Short of Judgement on the Merits
, 6 A.L.R. 2d 10, 70 (1949) (in Illinois "no case stating a general rule on [this] subject *** has been found; and none can safely be deduced from the cases").  See also 
Faber, Coe & Gregg
, 107 Ill. App. 2d at 210, 246 N.E.2d at 99 (declining to discuss, reconcile or distinguish the cases on this issue, rather falling back on the general rule and refusing to apply the doctrine of election of remedies).  But see 
Crown Life Insurance Company v. American National Bank and Trust Company of Chicago
, 35 F.3d 296, 299 (7
th
 Cir. 1994) (finding no election of remedy by a party that expressed an intent to declare a forfeiture of a contract because an "election of remedy only occurs when a party accepts the benefit of pursuing the initial remedy" and no forfeiture had actually been effected).

We find the rule stated in the Restatement (Second) of Contracts to be persuasive.

"If a party has more than one remedy under the rules stated in this Chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation."  Restatement (Second) of Contracts § 378 (1981).

The reporter's note states that the rule "under which the mere bringing of an action might amount to an election, is abandoned as no longer the weight of the authority."  Restatement (Second) of Contracts § 378 reporter's note cmt. A.  While there is old authority in Illinois supporting the earlier rule (see generally, Schopler, 6 A.L.R.2d at 72; see, 
e.g.
,
 Hanchett v. Riverdale Distillery Co.
, 15 Ill. App. 57 (1884) ("a suit brought by the vendor against the vendee for the price of the goods with knowledge of the fraud by which the sale was effected, affirms the sale, and he can not thereafter rescind the same")), there is more recent authority indicating a shift towards the rule of the Second Restatement (see, 
e.g.
, 
Gironda v. Paulson
, 238 N.E.2d 1081, 1084, 605 N.E.2d 1089, 1091 (1992) ("The election of remedies doctrine applies in cases of alternative pleading only where the opposing party has substantially altered his position in reliance on the plaintiff's choice"); 
Finke v. Woodard
, 122 Ill. App. 3d 911, 919, 462 N.E.2d 13, 19 (where defendant did not substantially change his position in reliance on plaintiff's initial claim for damages, there was no election of remedies and plaintiff was permitted to later add an equitable claim for rescission and it was proper to submit both the legal and equitable claims to the jury); 
Altom v. Hawes
, 63 Ill. App. 3d 659, 662-63, 380 N.E.2d 7, 9 (1978) (citing the Restatement and Corbin)).

The comment to the Restatement explains that a "change of position is 'material' within the meaning of *** Section [378] if it is such that in all the circumstances a shift in remedies would be unjust."  Restatement (Second) of Contracts § 378 cmt. a.  Corbin is in substantial agreement with the Restatement.  5A Corbin on Contracts § 1220.  Corbin states that a choice of remedy will only be a bar to an alternative remedy if "the party against whom the remedy is asked makes a substantial change of position in reliance on the manifestation of intention before notice of its retraction." 5A Corbin on Contracts § 1220.  Corbin further adds that the conclusiveness of an election is "dependent on the existence of facts sufficient to create an 'estoppel.'" Corbin § 1220.  These positions have been adopted in Illinois.  See 
Altom
, 63 Ill. App. 3d at 662, 380 N.E.2d at 9; accord 
Monmount Public Schools, District 38 v. D. H. Rouse Co.
, 153 Ill. App. 3d 901, 506 N.E.2d 315 (1987) (letter terminating contract to repair a roof was not an election of remedies where the contractor had not yet started work on the roof and took no affirmative action in reliance on the letter). 

Each of the cases which Kel-Keef has cited in support of its contention that a suit not prosecuted to judgement constitutes an election are distinguishable, in that in each case the plaintiff had obtained satisfaction on one of the inconsistent remedies or declared forfeiture of the contract at issue.  For example, in 
Lombard v. Elmore
, 112 Ill. 2d 467, 493 N.E.2d 1063 (1986), one of the plaintiff's inconsistent claims was prosecuted to judgement.  
Lombard v. Elmore
, 134 Ill. App. 3d 898, 902, 480 N.E.2d 1329, 1332 (1985).  See also 
SJS Investments, Ltd. v. 450 East Partnership
, 232 Ill. App. 3d 429, 433, 597 N.E.2d 1213, 1215 (1992)(plaintiff obtained one of his remedies-the return of his earnest money); 
Cala v. Gerami
, 137 Ill. App. 3d 936, 938-9, 484 N.E.2d 1199, 1202 (1995)(plaintiff declared forfeiture of the contract at issue); 
Bruno Benedetti & Sons, Inc. v. O'Malley
, 124 Ill. App. 3d 500, 508, 464 N.E.2d 292, 298 (1984)(plaintiff declared forfeiture of the contract at issue).

Furthermore, Kel-Keef's and the trial court's reliance on 
Douglas Theater Corp. v. Chicago Title & Trust Co.
, 288 Ill. App. 3d 880, 681 N.E.2d 564 (1997), for this contention appears to be entirely erroneous.  In 
Douglas Theater
 the court stated:

"While a plaintiff may pursue a remedy at law for damages and alternatively seek specific performance of the contract, plaintiff cannot have it both ways.  Plaintiff cannot affirm the contract, obtain specific performance and, in essence, erase the breach, yet also seek damages at law for breach of contract."

We find nothing in the language of the 
Douglas Theater
 decision to support either Kel-Keef's argument or the holding of the trial court.  In fact, 
Douglas Theater
 appears to support the opposite proposition, as it states that a plaintiff "may pursue a remedy at law for damages 
and
 alternatively seek specific performance."  
Douglas Theater
 only prevents a plaintiff from seeking a remedy once a remedy inconsistent with the remedy sought is obtained. 

In this case, following the rule of the Restatement, QCC II's suit at law for damages did not constitute an election of remedies under the rule of the Restatement.  Nothing in the record indicates that Kel-Keef materially changed its position in reliance on QCC II's  bringing the suit at law.  Also, there is no argument that at the time QCC II attempted to elect not to pursue its remedy of damages that the verdict for breach of contract in the suit at law had not been entered as a final judgement.  Since bringing the suit at law did not constitute an election, and QCC II initially prevailed in both suits, QCC II was required to elect which remedy it wished to pursue before final judgement was entered in either case.  
Majcher v. Laurel Motors, Inc.
, 287 Ill. App. 3d 719, 726, 680 N.E.2d 416, 421 (1997).  QCC II expressly elected that it wished to abandon its remedy of damages in favor of being excused from the contract.  Furthermore, once QCC II's election was made it became final and irrevocable.  See generally, 16A I.L.P. Election of Remedies §5; 
Moran v. Union Bank of Chicago
, 352 Ill. 503, 508, 186 N.E. 182, 184 (1933)(an election "once manifested by appropriate words or acts, is irrevocable"); 
Sluka v. Bielicki
, 335 Ill. 202, 210, 167 N.E. 90, 93 (1929)("where the doctrine of election of remedies applies, the bar arises as soon as the choice is made, and becomes full and absolute against the other remedy at the time of the filing of the petition, declaration or claim." 

B.  DID KEL-KEEF MATERIALLY BREACH THE CONTRACT?

QCC II next argues that it is entitled to be discharged from its obligations under the purchase agreement based on the court's initial finding in the chancery case that Kel-Keef materially breached the purchase agreement.  Kel-Keef argues that it is unclear that the court's finding of a material breach survived the judge's reconsideration; that it did not breach the contract; that even if it did breach the contract the breach was not material; and that it is thus entitled to receive payment under the contract.  

As a preliminary matter, the trial court's holding that QCC II elected a remedy of damages was erroneous for the reasons previously discussed and this erroneous holding was the basis of the trial court's judgement in the chancery case requiring QCC II to perform under the purchase agreement.  Although this basis for the trial court's holding must therefore be rejected, we must nevertheless determine whether there is any other support in the record for a judgement in favor of Kel-Keef in the chancery action.  
Massie v. Minor
 307 Ill. App. 3d 115, 121, 716 N.E.2d 857, 862 (1999)(appellate court may affirm the judgement of the trial court on any basis in the record).  Hence we must consider the issues raised regarding the materiality of the breach.  

The trial court's pre-reconsideration factual finding that Kel-Keef materially breached the contract would, if accepted on appeal, eliminate any such alternative support for the judgement in favor of Kel-Keef in the chancery action.  
Israel v. National Canada Corp.
, 276 Ill. App. 3d 454, 461, 658 N.E.2d 1184, 1191 (1995) (plaintiff must show it substantially performed in order to recover on a contract).  Thus, whether Kel-Keef can still prevail in this appeal depends on our evaluation as to whether Kel-Keef materially breached the contract.  
Meade v. Kubinski
, 177 Ill. App. 3d 1014, 1024, 661 N.E.2d 1178, 1185 (1996) (holding that whether a party has breached a contract is a question of fact). 

Kel-Keef argues that the status of the trial court's initial, pre-reconsideration findings of fact is unclear in light of the court's reconsideration and subsequent judgement in favor of Kel-Keef in the chancery suit.  We disagree.  After reconsideration the court found for Kel-Keef in the chancery suit after holding that QCC II was not excused from paying under either the purchase agreement or the non-competition agreement because QCC II had elected to pursue the remedy of damages which was inconsistent with a discharge of QCC II's obligations under the purchase agreement.  The court did not base its reconsideration on a re-evaluation of its earlier factual findings, but on the doctrine of election of remedies.  Thus, the court's earlier factual findings stand and are not affected by the court's subsequent reconsideration.  

The factual findings in this case present a somewhat unique situation.  Normally a court's findings of fact are reviewed under the manifest weight of the evidence standard.  
Meade v. Kubinski
, 177 Ill. App. 3d 1014, 1024, 661 N.E.2d 1178, 1185 (1996) ("Whether a party has breached a contract is a question of fact, and a finding of a breach or lack of a breach will not be disturbed unless it is contrary to the manifest weight of the evidence").  Furthermore the "trial court's finding must be given great deference because the trial court has the opportunity to view and evaluate witnesses' testimony and is, therefore, in the best position to evaluate their credibility."  
Raclaw v. Fay, Conmy and Co.
, 282 Ill. App. 3d 764, 767, 668 N.E.2d 114, 117 (1996).  In this case, we are presented with a rather novel situation where giving deference to the trial judge's findings of fact with regard to the materiality of the breach would result in a reversal of the chancery court's judgement, since that judgement was based on an erroneous election of remedies ruling.  Nevertheless, the rationale for deferring to a trial court's finding under the manifest weight of the evidence standard must still prevail.  Underlying that standard "is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof."  
Greene v. City of Chicago
, 73 Ill. 2d 100, 110, 382 N.E.2d 1205, 1210 (1978).  This rationale must be adhered to even though it leads to the ultimate reversal of the trial court's judgement.  The alternative, that this court re-evaluate the evidence without having seen or heard the witnesses simply to preserve the trial court's judgement, makes little or no sense.  Nor would a remand to the trial court have any efficacy since the trial court's finding is already known.

1.  DID KEL-KEEF BREACH THE PURCHASE AGREEMENT?

QCC II apparently first argues that Kel-Keef breached the purchase agreement because it breached the express warranty of title contained in the purchase agreement with respect to the sold assets in that it did not have good title to 53 of the blueprints included in the assets sale.  Kel-Keef argues that it did not breach the purchase agreement because there was no warranty that it transferred good title in the sold assets (including the 53 blueprints) to QCC II.  In support, Kel-Keef contends that the express warranty of title in the purchase agreement had lapsed due to its express two year limitation; that the side letter was in any event effective to disclaim the express warranty; and for that matter that the side letter was also effective to exclude any implied warranty of title under the UCC.

 We agree with Kel-Keef's argument that the express warranty in the purchase agreement is subject to a two year limitation and is thus unavailable to QCC II.  The purchase agreement contains a clause stating that the "representations and warranties set forth in this Agreement, or made pursuant to this Agreement, shall remain in full force and effect *** and shall survive the Closing and the transfer of the Sold Assets for a period of two (2) years."
(footnote: 3)  QCC II's action at law was filed in 1995, more than two years after the purchase agreement was executed in 1989.  There was thus no express warranty of title beyond two years and a claim that Kel-Keef breached the contract may not be predicated on a breach of that express warranty.  Because we conclude that the express warranty fails due to its two-year limitation, we need not address how the side letter affects it. 

QCC II next argues that even if the express warranty was not effective, Kel-Keef breached the implied warranty of title under section 2-312 of the UCC.  810 ILCS 5/2-312.  Kel-Keef argues that the side letter was sufficient to exclude the implied warranty of title.  We agree with QCC II.

A warranty of title may be excluded or modified by specific language giving the purchaser reasons to know that the vendor is only selling what title he possesses.  810 ILCS 5/2-312;  
Rockdale Cable T.V. Co. v. Spadora
, 97 Ill. App. 3d 754, 757, 423 N.E.2d 555, 558 (1981).  Very "precise and unambiguous language must be used to exclude a warranty so basic to the sale of goods as is title."  
Jones v. Linebaugh
, 191 N.W.2d 142, 144-45 (Mich. App. 1971).  Furthermore, where the language in a purported disclaimer expresses how the seller's liability will be limited rather than what title (or lack thereof) the seller purports to transfer, the purported disclaimer is ineffective.  In  
Sunseri v. RKO-Stanley Warner Theaters, Inc.
, 374 A.2d 1342, 1344 (Pa. Super. 1977), a case cited with approval by the 
Rockdale
 court (
Rockdale
, 97 Ill. App. 3d at 757, 423 N.E.2d at 558), the court found language stating that the seller "shall in nowise be *** liable *** upon or under guaranties [sic] or warranties *** including, but not limited to, the implied warrant[y] of title" insufficiently specific to disclaim the warranty of title.  The court reasoned that the language used was ineffective because it was "couched in negative terminology, expressing what the seller will not be liable for rather than what the buyer is or is not receiving."  
Sunseri
, 374 A.2d at 1345.  The court suggested that the 2-312 warranty of title could effectively be disclaimed by language stating that "the seller does not warrant that he has any right to convey the title to the goods."  
Sunseri
, 374 A.2d at 1345.  See also 
Rockdale
, 97 Ill. App. 3d at 757, 423 N.E.2d at 558 (finding language stating that the seller purports to transfer only such "right, title and interest" as he may possess insufficient to disclaim the implied warranty of title).   

The language in the side letter in the case at bar is insufficiently specific to disclaim the implied warranty of title.  The letter does not mention the warranty of title, but merely references a lawsuit 
(Rockwell Graphics Systems, Inc. v. DEV Industries, Inc.
 (Rockwell I)) and states that the vendor is "making no representations or warranties with regard to" that lawsuit.  Like the language rejected by the court in 
Sunseri
, the letter is too vague and general; it does not focus on the title to any of the assets which the purchaser may or may not be receiving in the transaction, but rather focuses on the liability of the seller.

We also disagree with Kel-Keef's apparent argument that there were circumstances sufficient to put QCC II on notice and sufficient to exclude the 2-312 warranty of title.  A warranty of title may be excluded by circumstances which give the buyer reason to know that the seller does not claim title in himself or that the seller is purporting to sell only the title which he has.  810 ILCS 5/2-312(2).  Circumstances may be sufficient to exclude the 2-312 warranty of title even if it has not been excluded by sufficiently specific language.  See, 
e.g.
, 
Rockdale
, 97 Ill. App. 3d at 757, 423 N.E.2d at 558 (where language in the bill of sale was insufficient to disclaim the implied warranty of title, evidence of a conversation between the parties which put the buyer on notice that the seller was selling only what right he possessed in the subject matter constituted sufficient circumstances to exclude the warranty of title).  In this case there are no such circumstances.  The side letter states that QCC II is on notice about the lawsuit it references, and that no representations or warranties are made with regard to the lawsuit.  It does not say, however, that the lawsuit may affect QCC II's title to some of the sold assets.  Furthermore, Stoneham testified that Fleck had told him that everything in the blueprint files was "clean."  In light of the above, we can not say that the court's finding in the chancery case that Kel-Keef breached the contract was against the manifest weight of the evidence.

Moreover, we disagree with Kel-Keef's implied but unarticulated argument that the implied warranty of title will not operate in this case because it is displaced by the express warranty of title in the purchase agreement.  Warranties are to be construed as cumulative and consistent when possible.  See 810 ILCS 5/2-317.  See also 
Heat Enchanters Inc. v. Aaron Friedman, Inc.
, 96 Ill. App. 3d 376, 386, 421 N.E.2d 336, 343 (1981) ("whenever reasonable, warranties should be construed as consistent and cumulative").  Furthermore, as we have noted above, language must be specific to disclaim the implied warranty of title.  810 ILCS 5/2-312(2).  We are mindful of the rule of 2-

317(c) (which we note the parties did not bother to raise) which states that express warranties displace implied warranties. 810 ILCS 5/2-317(c).  However, although the 2-312 warranty of title does function like an implied warranty, it is technically not considered an "implied" warranty under the UCC.  810 ILCS 5/2-

312(1) cmt. 6.  It appears from committee comment six that the 2-

312 warranty of title was not designated as an implied warranty to prevent the 2-316 disclaimer provisions from applying to it in place of the internal disclaimer provisions provided by 2-312(2).  810 ILCS 5/2-312 cmt. 6 ("The warranty of subsection (1) is not designated as an 'implied' warranty, and hence is not subject to Section 2-316(3).  Disclaimer of the warranty of title is governed instead by subsection (2) which requires either specific language or the described circumstances").  The same analysis which the committee comment makes with respect to 2-316 applies also with respect to 2-317(c).  If the warranty of title is not designated as an implied warranty with respect to 2-316 it likewise does not come within the purview of 2-317(c) as both purport to apply only to "implied" warranties.  Furthermore, the express warranty of title does not contain language which is specifically inconsistent with the implied warranty of title.  See 
Sutter v. St. Clair Motors, Inc.
, 44 Ill. App. 2d 318, 323 194 N.E.2d 674, 677 (1963) (express warranty not inconsistent with implied warranty where nothing in the express warranty specifically negatived the implied warranty or brought such an attempt to negative the implied warranty to the buyer's attention).

2.  WAS THE BREACH MATERIAL?

QCC II next contends that Kel-Keef's breach of the purchase agreement was material.  Kel-Keef argues that even assuming that it did breach the purchase agreement, the trial court's finding that the breach was material was against the manifest weight of the evidence.  Here too we agree with QCC II.

A material breach by one party to a contract discharges the other party from performing its obligations.  
Dragon Construction, Inc. v. Parkway Bank & Trust
, 287 Ill. App. 3d 29, 33, 678 N.E.2d 55, 58 (1997).  "The issue of whether or not a breach of contract is 'material,' thereby discharging the other's duty to perform, is a question to be decided on the inherent justice of the matter."  
Susman v. Cypress Venture
, 187 Ill. App. 3d 312, 316, 543 N.E.2d 184, 187 (1989).  The "determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-

breaching party will result in his accrual of an unreasonable or unfair advantage."  
Sahadi v. Continental Illinois National Bank & Trust Co.
, 706 F.2d 193, 196 (7
th
 Cir. 1983).   

Based on our review of the record, we cannot say that the trial court's finding that Kel-Keef's breach was material was against the manifest weight of the evidence.  William Guckien testified that the blueprints were "critical" to the company because the parts which QCC II sold were made from the blueprints.  After QCC II was forced to turn over the 53 blueprints to Rockwell, the cost of acquiring the parts described by those 53 blueprints increased.  To obtain the parts without the blueprints, QCC II had to either pay someone to reverse engineer the parts or purchase the parts from someone who had the blueprints.  Because both of these options were more expensive than having the parts manufactured from blueprints, QCC II became less competitive.  While there was evidence that the 53 blueprints returned to Rockwell were only a small fraction of the entire assets purchased, it is not the place of this court to re-evaluate the evidence weighed by the trial court where there is sufficient evidence in the record to support the trial court's finding that the breach was material.  It is not the number of blueprints per se which is important, but the financial significance of the blueprints to which QCC II never received good title.  There is evidence in the record to indicate that the 53 blueprints were very significant financially, even if this evidence was rejected by the jury.  See 
Mayfair Construction Co. v. Waveland Associates Phase I Limited Partnership
, 249 Ill. App. 3d 188, 202, 619 N.E.2d 144, 154 (1993) (party's refusal to submit construction contract disputes to architect for arbitration as per the contract was a material breach where there was an immediate financial impact on the other party).  

C.  DOES KEL-KEEF'S BREACH OF THE PURCHASE AGREEMENT ALSO CONSTITUTE A BREACH OF THE NON-COMPETITION AGREEMENT BECAUSE THE TWO AGREEMENTS WERE PART OF ONE CONTRACT FOR THE SALE OF A BUSINESS?

QCC II next argues that the purchase agreement and the non-

competition agreement were part of a single transaction for the purchase and sale of a business, and that Kel-Keef's breach of contract thus justified QCC II's non-performance of both the purchase agreement and the non-competition agreement.  In support, QCC II contends that the trial court ruled without authority that the non-competition agreement was a separate agreement and that a breach of the purchase agreement does not also constitute a breach of the non-competition agreement.  We disagree.

"The general rule is that in the absence of evidence of a contrary intention, where two or more instruments are executed 
by the same contracting parties
 in the course of the same transaction, the instruments will be considered together *** because they are, in the eyes of the law, one contract."  
(Emphasis added.)  
Tepfer v. Deerfield Savings & Loan Ass'n
, 118 Ill. App. 3d 77, 80, 454 N.E.2d 676, 679 (1983).  Furthermore, it has been held generally that a material breach of an agreement discharges the non-breaching party from a covenant not to compete.  
Galesburg Clinic Ass'n v. West
, 302 Ill. App. 3d 1016, 1018, 706 N.E.2d 1035, 1036-37 (1999).  However these two foregoing generalities are not dispositive in this instance.  We first note that the parties to the two instruments are not the same, which challenges the notion that these two contracts are one.  Both Kel-

Keef and Fleck are parties to the purchase agreement, but only Fleck is a party to the non-competition agreement and Fleck is not a party to the promissory note.  Moreover, even if we are to construe the promissory note and the non-competition agreement as one contract, that would still raise questions of severability.  Whether a contract is entire or severable is a question of fact.  See 
Carvel Co. v. Spencer Press, Inc
., 708 A.2d 1033, 1035 (Me. 1998); 
Mortenson Co. v. Timberline Software Corp.
, 970 P.2d 803, 807 (Wash. App. 1999); see generally, 17B C.J.S. Contracts § 791.  Therefore we review the trial court's determination that the contracts are severable under the manifest weight of the evidence standard.

The "rule that rescission of a contract must be in toto does not apply to a contract of which the parts are so severable as to form independent contracts."  
Kaplan v. Keith
, 60 Ill. App. 3d 804, 808, 377 N.E.2d 279, 281 (1978).  "The question whether a contract is entire or severable cannot be determined by any precise rule."  
Keeler v. Clifford
, 165 Ill. 544, 547, 46 N.E. 248, 249 (1897).  Whether a contract is severable depends on the intention of the parties.  
Kaplan
, 60 Ill. App 3d at 808, 377 N.E.2d at 279.  In determining the intention of the parties, useful factors include whether performance by one party consists of distinct and separate items and whether the price is apportioned for each item of performance.  
Kaplan
, 60 Ill. App 3d at 808, 377 N.E.2d at 279 (finding a release to be severable from a real estate sale contract where $500 was directly apportioned for the execution of the release).

In this case, the non-competition agreement and the purchase agreement would be severable even if they were in the same instrument and rescission of one does not necessitate rescission of the other.  The two agreements provide for two distinct and separate performances by the vendors.  The purchase agreement provides for the transfer of the assets of the replacement parts business from Kel-Keef to QCC II, while the non-competition agreement provides that Fleck is not to compete with QCC II for five years.  Furthermore, separate consideration was given by QCC II for the purchase agreement and the non-competition agreement.  We therefore find the trial court's determination that the agreements are severable is not against the manifest weight of the evidence, even though we might not uphold this finding under 
de
 
novo
 review.  Since the agreements are severable, rescission of the purchase agreement does not necessitate rescission of the non-

competition agreement.

E.  IS QCC II ENTITLED TO RECISSION AS A REMEDY

Finally, Kel-Keef argues that QCC II is not entitled to recission of the contract, or any similar remedy.  In support Kel-

Keef argues that QCC II never took steps to revoke the contract and that QCC II's dilatory conduct had ensured that the parties cannot be returned to the status quo.  We disagree with Kel-Keef's contention.  It is true that QCC II never expressly prayed for a remedy of recission; however, QCC II defended against Kel-Keef's claim by denying Kel-Keef's performance under the contract, which Kel-Keef was required to prove in order to recover on the contract.  It was on that basis that the trial court excused QCC II from performing the purchase agreement.  See 
Israel v. National Canada Corp.
, 276 Ill. App. 3d 454 , 461, 658 N.E.2d 1184, 1191 (1995)("the party seeking to enforce the contract has the burden of proving that he has substantially complied with all material terms of the contract"); 
R. Krevolin & Co. v. Brown
, 89 A.2d 255, 258 (N.J. Super. Ct. App. Div. 1952) ("Full or substantial performance of the promise of one party is a condition precedent to the right to maintain an action on the promise of the other unless the promise of the latter is independent of any performance by the former").  See also 
Brewer v. Custom Builders Corp.
, 42 Ill. App. 3d 668, 673, 356 N.E.2d 565, 570 (1976)("a contractor whose work amounts to less than substantial performance has no right to the contract price; he is said to have no remedy on the contract"); accord, 3A Corbin on Contracts, sec. 710.  The trial court found that Kel-Keef materially breached the contract, so it can hardly be said that Kel-Keef substantially performed. 

Kel-Keef further maintains that because QCC II's dilatory conduct in failing to inform Kel-Keef of its breach of the warranty of title ensured that the parties cannot be returned to the status quo, recission is improper.  We disagree.  As noted above, QCC II is not excused from its performance of the contract here under a doctrine of recission per se, but because Kel-Keef failed to show that it had substantially performed under the contract.  Kel-Keef has not presented any authority suggesting that QCC II's dilatory conduct should excuse Kel-Keef from the requirement that it prove substantial performance, a condition precedent in order for Kel-Keef to recover under the contract.  Kel-Keef's authority is inapposite, as in each case recission was raised offensively by the promisee (see 
Puskar v. Hughes
, 179 Ill. App. 3d 522 (1989); 
Luciani v. Bestor
, 106 Ill. App. 3d 878 (1982)), unlike this case where the non-performance of the contract is raised defensively and premised upon the vendor's failure to prove that he performed. 

Moreover, implicit in the court's finding that QCC II is excused from performance under the purchase agreement is a determination that QCC II's conduct was timely.  Whether QCC II's conduct was dilatory is a question of fact.  
Wainwright v. Elgin Windmill Co.
, 9 Ill. App. 2d 574, 134 N.E.2d 44 (1956) (reasonable time to give notice for breach of warranty a question of fact).  "Where delay in notification does not result in prejudice to the defendant, it is not generally viewed as unreasonable."  
Maldonado v. Creative Woodworking Concepts, Inc.
, 296 Ill. App. 3d 935, 940, 694 N.E.2d 1021, 1026 (1998).  In this case the evidence does not compel a finding of dilatory conduct.  The materials in question consist of items such as blueprints which are not likely to deteriorate.  Furthermore, while QCC II purchased the sold assets in 1989 it was not until 1993 that QCC II fully discovered that they lacked title to 53 of the blueprints as the consent decree in which Fleck admitted to misappropriation was signed on December 14, 1993.  QCC II's attorney sent Kel-Keef a letter dated June 3, 1994, informing him of the alleged breach of the contract, and QCC II thus notified Kel-Keef of its breach less than one year after QCC II discovered that Fleck had indeed misappropriated blueprints from Rockwell.  We cannot say that a delay of less than a year between QCC II's full discovery of the breach and its notification of Kel-Keef was unreasonable per se and we therefore defer to the implicit findings of the trial court which are not contrary to the manifest weight of the evidence.

F.  THE FRAUD CLAIM 

QCC II argues that the trial court abused its discretion by excluding evidence of a lawsuit which existed at the time of the contract, but which was not disclosed to QCC II by Kel-Keef.  Kel-

Keef argues that QCC II has waived this issue on appeal because QCC II failed to raise it in a post-trial motion.  Kel-Keef further argues that even if this issue was not waived by QCC II the evidence was properly excluded because it was highly prejudicial.  We agree with Kel-Keef.

In order to preserve an issue for review a party must make both an objection at trial and a written post-trial motion raising the issue.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988).  In this case, QCC II has not pointed this court to any post-trial motion raising this issue, and our review of the record has not revealed any such motion.  QCC II has waived this issue on appeal.  Likewise, we need not address the arguments relating to damages in the suit at law, as QCC II has abandoned its claim for damages.

II.  KEL-KEEF'S Cross-appeal

A.  BREACH AND DAMAGES

Kel-Keef first argues on cross-appeal that it did not breach the contract and that the trial court erred in not granting its motion for directed verdict on that issue in the suit at law.  We have already addressed the issue of Kel-Keef's alleged breach of contract in the context of the chancery case and concluded that Kel-Keef did indeed breach the contract.  Therefore, we need not revisit this issue here.  We also decline to address Kel-Keef's claim that QCC II presented insufficient evidence as to damages, as QCC II has abandoned that remedy, and therefore this point is moot.

B.  ATTORNEY FEES

Kel-Keef next argues that QCC II is not entitled to the attorney fees it was awarded in the case at law.  The purchase agreement provides that attorney fees may be awarded to the prevailing party in any litigation brought for its breach.  "A party can be considered a 'prevailing party' for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit [citation] receives a judgement in his favor [citation] or by obtaining an affirmative recovery."  
Grossinger Motorcorp, Inc. v. American National Bank and Trust Co.
, 240 Ill. App. 3d 737, 753, 607 N.E.2d 1337, 1348 (1992).  "To qualify as a prevailing party, a plaintiff must succeed in obtaining some relief from the defendant against whom attorney fees are sought." 
Community Consolidated School District No. 54 v. Illinois State Board of Education
, 216 Ill. App. 3d 90, 93, 576 N.E.2d 250, 253 (1991).  Since we hold that QCC II has abandoned its remedy in its action at law and QCC II has therefore not obtained any relief against Kel-Keef as a result of the action at law, QCC II can no longer be said to have prevailed in that action.  Even if QCC II has prevailed on the issue of breach of contract in the action at law, QCC II has received no benefit, judgement or affirmative recovery from bringing the suit at law.  The award of attorney fees to QCC II is thus vacated.  Whether a similar award of fees (or any award at all) would be appropriate in the chancery action is a matter which should be determined in the context of the chancery action itself.  See 
Berlak v. Villa Scalabrini Home for the Aged, Inc.
, 284 Ill. App. 231, 671 N.E.2d 768 (1996).  We thus remand to the trial court for a determination of that issue.

III.  CONCLUSION
(footnote: 4)
With regard to QCC II's appeal, in the chancery action the judgement of the chancery court on count I (breach of the promissory note) and on count II (personal guarantee of the promissory note) against QCC II, Guckien and Stoneham jointly and severally is reversed and remanded to the trial court with directions that judgement be entered in favor of QCC II on count I and in favor of Guckien and Stoneham on count II and that the trial court determine whether and to what extent QCC II is entitled to attorney fees.

The judgement of the chancery court on count IV (breach of the non-competition agreement) and count V (personal guarantee of the non-competition agreement) in favor of Fleck and against QCC II, Guckien and Stoneham, jointly and severally is affirmed.

With regard to the suit at law the judgement of the trial court on count I (fraud) in favor of Fleck and Kel-Keef and against QCC II is affirmed.  The judgement on count II (breach of contract) in favor of QCC II and against Kel-Keef for $60,000 is vacated pursuant to the election by QCC II to forgo the award of damages in the action at law, as is the award of attorney fees.

With regard to Kel-Keef and Fleck's cross-appeal from the action at law, we have already vacated the judgement of the trial court on count II in favor of QCC II and against Kel-Keef on the grounds that QCC II has elected to accept the chancery remedy.  We have also vacated the award of attorney fees in that action.  Accordingly the issues raised by the cross-appellants as to the action at law are moot.

Affirmed in part; reversed in part; cause remanded to the chancery court below.

COUSINS, P.J., and McNULTY, J., concur.

FOOTNOTES
1:
The court did not distinguish between Fleck and Kel-Keef in its initial opinion.

2:
Because the briefs filed by the parties treat QCC II, Stoneham and Guckien as one, QCC II will refer to all three parties in the analysis section, except where otherwise noted, or the parties are referred to individually.

3:
The trial court granted a directed verdict with regard to count III of QCC II's complaint at law which claimed breach of warranty, because the warranty had expired. 

4:
In the conclusion, references to QCC II refer only to the corporate entity and not to Guckien and Stoneham who are referred to separately by name.