COLLOTON, Circuit Judge,
dissenting.
The question presented on this appeal is whether the agreement between Interstate Bakeries Corporation (IBC) and Lewis Brothers Bakeries (LBB) is an executory contract subject to assumption or rejection under 11 U.S.C. § 365(a). To answer that question, it is necessary first to identify what constitutes the agreement at issue. In December 1996, the parties entered into an Asset Purchase Agreement that transferred IBC’s Butternut Bread and Sunbeam Bread business operations and assets in two territories to LBB, and a License Agreement that authorized LBB to use IBC’s trademarks in those territories under a perpetual, royalty-free, and exclusive license. The court focuses on the License Agreement alone, but the relevant contract is an integrated agreement that includes both the Asset Purchase Agreement (“APA”) and the License Agreement. That integrated agreement is not executo-ry, so I would reverse the judgment of the district court.[4]
Under Illinois law, the question whether a contract is a separate agreement “depends on the intention of the parties as manifested by the specific contract terms.” Stratemeyer v. West 136 Ill.App.3d 1095, 91 Ill.Dec. 840, 484 N.E.2d 399, 400 (1985). “The general rule is that in the absence of a contrary intention, where two or more instruments are executed by the same contracting parties in the course of the same transaction, the instruments will be considered together ... because they are, in the eyes of the law, one contract.” Tepfer v. Deerfield Savs. & Loan Ass’n, 118 Ill.App.3d 77, 73 Ill.Dec. 579, 454 N.E.2d 676, 679 (1983); see Kel-Keef Enters., Inc. v. Quality Components Corp., 316 Ill.App.3d 998, 250 Ill.Dec. 308, 738 N.E.2d 524, 538 (2000). “A contract should be treated as entire when, by a consideration of its terms, nature, and purposes, each and all *1077 of the parts appear to be interdependent and common to one another and to the consideration.” Trapkus v. Edstrom’s Inc., 140 Ill.App.3d 720, 95 Ill.Dec. 119, 489 N.E.2d 840, 346 (1986).
The APA and the License Agreement should be considered together as one contract. IBC and LBB entered into the APA and the License Agreement contemporaneously on December 28, 1996. The APA lists the license as an asset sold to LBB pursuant to the sale. It directs the parties to enter into the License Agreement “[u]pon the terms and subject to the conditions contained in [the APA].” Both documents define the “Entire Agreement” as including each other. The APA’s definition includes “the exhibits and schedules hereto,” and a model for the License Agreement is included as an exhibit to the APA. The License Agreement defines the entire agreement to include “the Exhibits and Schedules hereto and the agreements referenced herein,” and it references the APA throughout the agreement. The License Agreement states that as consideration for the license, LBB “has paid to IBC a fee of ten dollars ($10.00), and other good and valuable consideration, set forth in the Allocation Agreement described in Section 2.3 of the Purchase Agreement.” To treat the License Agreement as a separate agreement not only would run counter to the plain language of both the APA and the License Agreement, which describe the two as one piece, but would ignore the valuable consideration paid for the license, which obviously exceeded ten dollars.
The ultimate question, then, is whether this integrated agreement is an executory contract under the Bankruptcy Code. This circuit has adopted Professor Countryman’s definition of an executory contract for purposes of the Bankruptcy Code: “a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.” In re Craig, 144 F.3d 593, 596 (8th Cir. 1998) (internal quotation omitted); see Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973).
The parties dispute whether we should apply the doctrine of substantial performance in determining whether the contract is executory. Under this doctrine, the nonbreaching party’s performance is not excused if the breaching party has “substantially performed.” In re Exide Techs., 607 F.3d 957, 963 (3d Cir.2010). According to IBC, the doctrine does not apply, and we should look only at the remaining obligations on each side and ignore the obligations that the parties have already performed. The majority apparently takes this approach.
The doctrine of substantial performance, however, is inherent in the Countryman definition of executory contract. Substantial performance and material breach are interrelated concepts: “Substantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused.” 15 Richard A. Lord, Williston on Contracts § 44:55 (4th ed. 2000). Consistent with that interrelationship, the Countryman definition calls for the court to examine whether the obligation of the parties to the contract “are so far underperformed” that a failure to complete performance would be a material breach. Craig, 144 F.3d at 596. This inquiry requires a comparison of the performed obligations with the underperformed obligations. For example, Professor Countryman’s seminal article explains *1078 when a nonbankrupt building contractor has “fully performed save that he has failed to connect the water or has made a defective connection,” the bankrupt party on the other side of the contract would be entitled to damages, but not to refuse acceptance of the building or to excuse his performance. Countryman, supra, 57 Minn. L.Rev. at 457. That is so, because the building contractor has substantially performed.
IBC argues that this court must look to state law in applying the Countryman definition, and that the doctrine of substantial performance would not apply under Illinois law. But cf. Cameron v. Pfaff Plumbing & Heating, Inc., 966 F.2d 414, 416 (8th Cir.1992) (holding that whether a contract is executory under § 365 “is a question of federal law, for it involves the extent to which Congress has exercised its constitutional power to establish ‘uniform Laws on the subject of Bankruptcies throughout the United States.’ ”) (quoting U.S. Const, art. I, § 8, cl. 4). Yet Illinois does recognize the doctrine of substantial performance, and Illinois law defines it as “performance in all the essential elements necessary to the accomplishment of the purpose of the contract.” W.E. Erickson Constr., Inc. v. Congress-Kenilworth Corp., 115 Ill.2d 119, 104 Ill.Dec. 676, 503 N.E.2d 233, 236-37 (1986) (internal quotation omitted). IBC argues that Illinois limits this doctrine to disputes under construction contracts, but IBC cites no case so holding. Just as the Third Circuit saw no reason to cabin the doctrine under New York law in Exide, 607 F.3d at 964, we should not confine the doctrine to construction cases when applying Illinois law.
To conclude that a contract is executory for purposes of § 365, the bankruptcy court must find that both parties have so far underperformed that a failure of either to complete performance would constitute a material breach excusing the perform-anee of the other. In re Craig, 144 F.3d at 596. The contract at issue here is not executory, because IBC substantially performed its obligations under the APA and License Agreement, and its failure to perform any of its remaining obligations would not be a material breach of the integrated agreement.
The majority identifies the following obligations of IBC as material: “obligations of notice and forbearance with regard to the trademarks,” and “obligations relating to maintaining and defending the marks, and other infringement-related obligations.” Ante, at 1075. The opinion does not specify the source of an obligation to “maintain and defend the mark,” and the agreement provides only that IBC has “the sole discretion ... to bring proceedings involving the Trademarks in its own name,” as well as “the sole right, but not the obligation,” to control the defense of any infringement suit brought by a third party. In any event, when the bankruptcy court reasoned that these “obligations” were material, that court rested its conclusion on the “factually analogous,” but now-reversed, decision of the Delaware bankruptcy court in Exide. See In re Interstate Bakeries Corp., 2010 WL 2332142, at *6 (Bankr.W.D.Mo.2010) (citing In re Exide Techs., 340 B.R. 222, 229 (Bankr.D.Del. 2006)). The district court in this case affirmed the bankruptcy court, but it did so after concluding only that the remaining obligations of one party, LBB, were material. In re Interstate Bakeries Corp., 447 B.R. 879, 884-86 (W.D.Mo.2011). Even assuming the district court’s analysis of LBB’s obligations was correct, the court neglected to consider the contractual obligations of IBC.
The remaining obligations of IBC are not material to the integrated agreement, and the contract between IBC and LBB is thus not executory for purposes of § 365. *1079 Material breaches are those that “go[ ] to the root or essence of the contract.” Williston § 44:55; see also Anderson v. Long Grove Country Club Estates, Inc., 111 Ill.App.2d 127, 249 N.E.2d 343, 349 (1969) (“A material or total breach is a failure to do an important, substantial or material undertaking set forth in a contract”). Here, the essence of the agreement was the sale of IBC’s Butternut Bread and Sunbeam Bread business operations in specific territories, not merely the licensing of IBC’s trademark. The agreement called for LBB to pay $20 million for IBC’s assets. The parties allocated $11.88 million for tangible assets, such as real property, machinery and equipment, computers and licensed computer software, vehicles, office equipment, and inventory. They allocated another $8.12 million toward intangible assets, including the license. IBC has transferred all of the tangible assets and inventory to LBB, executed the License Agreement, and received the full $20 million purchase price from LBB. IBC’s remaining obligations concern only one of the assets included in the sale (the license), and when considered in the context of the entire agreement, they are relatively minor. The majority relies on decisions holding that certain obligations can be material, see In re Qintex Entm’t, Inc., 950 F.2d 1492, 1495-96 (9th Cir.1991); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1045-46 (4th Cir.1985), but the cited authorities involve stand-alone licensing agreements, not licensing agreements that are part of a larger asset sale agreement. They also concern contractual obligations that differ from those remaining for IBC.
We should follow the lead of the Third Circuit in Exide. At issue in Exude was the $135 million sale of Exide’s industrial battery business to EnerSys, which included a trademark license agreement. 607 F.3d at 960. Along with the license, Exide sold to EnerSys physical manufacturing plants, equipment, inventory, and certain items of intellectual property. Id. at 960-61. The Third Circuit held that Exide’s remaining obligations, which included duties to maintain quality standards, to refrain from use of the trademark outside the industrial battery business, and to indemnify EnerSys, did not “outweigh the substantial performance rendered and benefits received by EnerSys.” Id. at 963-64. The court observed that the remaining contractual obligations did not relate to the purpose of the agreement, which was the sale of Exide’s industrial battery business. Id. So too here.
For these reasons, I would reverse the judgment of the district court.

. After this case was submitted, IBC filed for bankruptcy in the Southern District of New York, and this appeal was automatically stayed. See 11 U.S.C. § 362; Farley v. Henson, 2 F.3d 273, 274-75 (8th Cir.1993). The parties then obtained limited relief from the automatic stay "to allow the Eighth Circuit to issue a Ruling in the Pending Appeal,” but the bankruptcy court’s order does not authorize the parties "to take any further action before the Eighth Circuit ... with respect to ... the Pending Appeal.” Because the order does not authorize the parties to petition for rehearing, see Fed. R.App. P. 40, and because a mandate does not issue from this court until seven days after the time for filing a petition for rehearing expires, see Fed. R.App. P. 41, any opinion filed by this panel may be purely advisory. I would take no action until the parties obtain sufficient relief from the automatic stay to permit completion of the entire appellate process. Because the majority elects to proceed, however, I address the merits of the appeal.